UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SRQ TAXI MANAGEMENT, LLC

Plaintiff,

v. CASE NO.

SARASOTA MANATEE AIRPORT AUTHORITY,

Defendant.
______________________________________/

# COMPLAINT

Plaintiff, SRQ TAXI MANAGEMENT, LLC ("SRQ"), by and through its undersigned counsel, sues Defendant, SARASOTA MANATEE AIRPORT AUTHORITY (the "Authority"), and alleges as follows:

## Nature of Action and Jurisdiction

1. This is a civil action under 42 U.S.C. § 1983 seeking damages and injunctive relief against the Authority for committing acts, under the color of law, with the intent and for the purpose of depriving SRQ of its right to equal protection under the U.S. Constitution and for refusing or neglecting to prevent such deprivations and denials to SRQ.

2. Federal question jurisdiction is conferred on this Court by 28 U.S.C. § 1331 because SRQ's claims against the Authority arise, principally, under the U.S. Constitution pursuant to the Airport's deprivation of SRQ's right to equal protection under the law, as set forth in more detail below. This court has jurisdiction under 28 U.S.C. § 1367(a) over SRQ's claims for breach of contract and tortious interference with existing advantageous contracts.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Authority transacts business and maintains its principal corporate offices in this district. Moreover, the Authority's violation of SRQ's constitutional rights occurred in this district.

**Parties**

4. Plaintiff SRQ is a Florida limited liability company that has its principal place of business in Manatee County, Florida. SRQ, as the successor by assignment from Diplomat Airport Transportation, Inc., is the exclusive operator of on-demand metered taxicab and non-metered limousine service at the Sarasota Bradenton International Airport (the "Airport").

5. Defendant, Authority, is an independent special district created and governed by Chapter 2003-309, Laws of Florida that owns and operates the Airport. The Authority is a corporate body and a political subdivision of the State of Florida and a "person" subject to suit within the meaning of 42 U.S.C. Section 1983. The Authority has established certain Ground Transportation Operating Rules and Regulations (the "Rules") governing the operation of all commercial vehicle companies at the Airport. A true and correct copy of the Rules is attached hereto as **Exhibit A**.

**General Allegations**

6. On or about June 18, 2009 Diplomat Airport Transportation, Inc. ("Diplomat") entered into a certain Concession Agreement for On-Demand Metered Taxicab & Non-Metered Limousine Service (hereinafter the "On-Demand Concession Agreement") with the Authority. A true and correct copy of the On-Demand Concession Agreement is attached hereto as **Exhibit B**.

7. The On-Demand Concession Agreement had an initial term of five (5) years terminating on August 31, 2014 but also provided the Authority with an option to renew the agreement for an additional five (5) year term at the end of the initial term.

8. On or about March 25, 2014, the Authority exercised this option and renewed the On-Demand Concession Agreement for an additional five (5) year term beginning on September 1, 2014 and ending on August 31, 2019, on the same terms and conditions as were stated in the original agreement.

9. On or about May 11, 2016, the Authority's chairman approved an Assignment of the On-Demand Concession Agreement (the "Assignment") from Diplomat to SRQ. A true and correct copy of the approval of the Assignment is attached hereto as **Exhibit C**.

10. To fulfill its obligations to supply all of the on-demand transportation services at the Airport, SRQ has entered into numerous contracts with individuals to act as drivers and, in some cases as independent owner operators (hereinafter the "Driver Agreements").

11. In and around January 1, 2015, several transportation network companies ("TNCs"), including Uber Technologies, Inc. and possibly others, began providing on-demand, for-hire vehicle service at the Airport. From the beginning of the TNCs operations at the Airport, the Authority has, notwithstanding SRQ's demands that it do so, refused to enforce its Rules against the TNCs and has granted the TNCs certain privileges not granted to SRQ. The Authority's disparate treatment of the TNCs and SRQ is irrational and arbitrary because the TNCs and SRQ are similarly situated as both provide on-demand, for-hire ground transportation services at the Airport. SRQ and its predecessor Diplomat have lodged several complaints with the Authority since the TNCs began operating and made demand that the Authority equally enforce its Rules as to the TNCs. To date, the Authority has refused to do so.

12. Examples of the Authority's disparate, unequal and unconstitutional treatment in the application of its Rules include, but are limited to, the following:

a. not requiring the TNC's independent contractors/operators, who are operating vehicles at the Airport, to maintain the state required insurance for commercial for-hire vehicles in accordance with existing state statute and Sections 3.1.6 and 3.1.7 of the Rules (including the specific endorsement required by the Rules which, among other things, requires each policy to name the Authority as an additional insured);

b. not requiring the TNC vehicles to operate with the appropriate vehicle identification, trade dress and permits as required by Section 3.1.2 of the Rules;

c. not requiring all TNC commercial vehicles to be ten model years of newer as required by Section 3.1.1 of the Rules;

d. not requiring the TNC personnel to be properly licensed and adequately trained as required by Section 3.1.5 of the Rules;

e. not requiring compliance with applicable local, state and federal laws, including the Americans with Disabilities Act and the provisions of 49 CFR Part 21 requirements concerning non-discrimination in Federally Assisted Programs and Title 6 of the Civil Rights Act of 1964;

f. by providing preferable signage and queuing positions for the TNCs and their Operators over SRQ signage and queuing positions;

g. by providing preferable boarding and loading zones to the TNCs and their Operators over those provided to SRQ;

h. by not requiring the TNCs and their independent Operators to obtain and display their Ground Permit Stickers as required by Section 3.3.2 of the Rules;

i. by allowing TNC vehicles and their independent contractor/operators to repeatedly gain access and park in violation of Section 3.3.1 of the Rules;

j. by providing TNC vehicles with an exemption, which is inapplicable to every other commercial vehicle regulated by the Rules, to avoid the commercial vehicle queuing area and proceed directly to passenger pickup and boarding areas;

k. by not enforcing the existing requirement of Section 3.3.3 that pickups by Operators of commercial vehicles, including TNC vehicles, other than SRQ (as the Taxicab Concession Operator) may only be made after specific advance reservations have been made;

l. by not citing unauthorized vehicles operating as commercial for-hire vehicles at the Airport; and

m. by allowing, upon information and belief, TNCs and their independent contractor/operators to transfer, convey, sell, borrow or assign their permit(s), if any, to other non-approved drivers and vehicle operators in violation of Section 3.4.8 of the Rules (hereinafter collectively the "Violations")

13. Despite SRQ's demands that the Authority end its unconstitutionally disparate application of its Rules and treatment of SRQ and the TNCs, the Authority has refused to enforce

its Rules against the TNCs and continues to allow the TNCs to commit the Violations while strictly enforcing its Rules against SRQ.

14. Not only has the Authority violated SRQ's right to equal protection under the U.S. Constitution, but it has also breached the terms of the On-Demand Concession Agreement which grants SRQ the exclusive right to operate *on-demand, for-hire* vehicles at the Airport:

> **4.3 <u>Authority's Right to Permit Other Ground Transportation</u>**
>
> Such rights herein granted Concessionaire [SRQ] do not prevent the Authority from permitting other methods of passenger ground transportation, as for example rental cars, limousines, buses ***or private passenger cars not for hire.***
>
> A. The Authority reserves the right to authorize properly identified hotel, motel and rental car concessionaire courtesy cars ***operating on a not for hire basis*** to pick up their customers in the second lane of the ground transportation queuing area.
>
> B. The Authority reserves the right to permit other properly marked, licensed taxicabs and limos to pick up passengers ***who have made specific advance reservation*** for such pick-ups.

(emphasis added)

15. This language in the On-Demand Concession Agreement expressly limits any "other methods of passenger ground transportation" ***apart from those services to be provided by SRQ***, to services that are "not for hire" or to those requiring "specific advance reservation[s]."

16. TNCs do not fit in either of these exceptions to SRQ's exclusive contractual authority to operate because they are similarly situated to and provide the same type of service as SRQ—on-demand, for-hire ground transportation, as the Authority itself has recognized:

a. TNCs are included under the Authority's existing Rules as "for-hire" Commercial Vehicles and do in fact accept compensation for their services; and

b. TNC's, according to the Authority, provide *on-demand* transportation and do not utilize "specific advance reservations." As evidence, see attached hereto as **Exhibit D**, a screen print from the Authority's website that states: "When to request an Uber—Request your ride once you've collected your luggage from baggage claim and are ready to step outside." Additionally, the Authority's website provides a link to the Uber webpage describing its services at the Airport as "on-demand". See screen prints attached hereto as **Exhibit E**.

17. The On-Demand Concession Agreement, therefore, allows for very limited carve outs to SRQ's otherwise exclusive on-demand, for-hire transportation rights. The Concession Agreement's express inclusion of vehicles requiring "specific advance reservation[s]" and those not operating on a for-hire basis as exceptions to SRQ's otherwise exclusive for-hire rights necessarily implies the exclusion of other on-demand, for-hire ground transportation services such as a TNC.

18. The On-Demand Concession Agreement provides further evidence that SRQ was intended to provide all of the on-demand, for-hire ground transportation services to the Airport in the following sections:

**5.1 General Standards**

Concessionaire shall furnish good, prompt, and courteous service, ***adequate to reasonably meet all reasonable demands for on demand taxi/limo service at the Airport,*** including the providing of service to persons with disabilities consistent with state and federal law.

(emphasis added).

**5.2 Availability of Service**

***Concessionaire shall promptly furnish adequate taxi/limo service at all times during the day and night as may be required by passenger demand*** and

> as any certified passenger airline doing business at the Airport may from time to time reasonably request.

(emphasis added).

19. These provisions again demonstrate that SRQ, as the Concessionaire, was intended to provide ***"all"*** of the on-demand taxi/limo service at the Airport, at all times of the day or night.

20. The Authority, therefore, has breached and continues to breach its obligations under the On-Demand Concession Agreement by allowing TNCs to operate for-hire, on-demand transportation services in violation of SRQ's exclusive rights to provide such services under the On-Demand Concession Agreement.

21. However, even if the TNCs' method of passenger pickup, via a smart phone application and "e-hail" of an on-demand for hire vehicle, qualifies as a "specific advance reservation" under section 4.3(b) of the On-Demand Concession Agreement, the Authority has nevertheless breached Section 4.3 (c) of the On-Demand Concession Agreement which prohibits all other ground transportation providers from soliciting passengers in and around the Airport terminal complex. That section provides:

> The operations of such hotel, motel and rental car concessionaire courtesy cars, taxicabs and limos ***with advance reservations*** will not be permitted to engage in ***any solicitation*** of passengers at the terminal complex. (emphasis added).

22. The Authority's promulgated Rules define "solicitation" as "directly or indirectly, actively or passively, openly or subtly, ask, request, seek, or try to obtain the purchase, sale, lease or exchange of goods or services, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services, or any form of paid advertising."

23. The Authority has and continues to permit TNCs to engage in "solicitation" of passengers, and therefore is breaching the On-Demand Concession Agreement, by:

a. promoting TNCs on its website and thereby assisting them in soliciting passengers at the Airport terminal;

b. allowing TNCs to display advertising designed to solicit ground transportation passengers in the Airport terminals;

c. posting directional signage in the Airport terminal for specific TNC pick up areas that are designed to solicit for-hire ground transportation passengers and funnel them to the TNCs' service area; and

d. Allowing the TNCs to solicit riders through the use of its applications, while they are at the airport terminal complex.

24. SRQ has made demand that the Authority cure its breaches of the Agreement, stop its unconstitutional denial of equal protection under the laws by the unequal and disparate application of its Rules and remedy the Violations. See correspondence attached hereto as **Exhibit F**. Nevertheless, the Authority has refused to comply with SRQ's demand for compliance with the On-Demand Concession Agreement and continues to allow TNCs to commit the Violations while strictly enforcing the Rules against SRQ.

25. The Agreement provides for reimbursement to the Authority for any costs, expenses and attorneys' fees incurred in enforcing the terms of the On-Demand Concession Agreement. Pursuant to section 57.105 (7), *Florida Statutes*, SRQ is therefore also entitled to reimbursement of all costs, expenses and attorneys' fees it has incurred due to the Authority's breach of the On-Demand Concession Agreement.

26. Pursuant to 42 U.S.C. Section 1988, SRQ is also entitled to reimbursement for its attorneys' fees and costs incurred in pursuing its claims under 42 U.S.C. Section 1983.

27. SRQ has retained the undersigned attorneys to represent it in this action and is obligated to pay these attorneys a reasonable fee for their services rendered.

28. All conditions precedent to maintaining this action have either occurred, been excused, or otherwise have been waived.

**COUNT I- DAMGES UNDER 42 U.S.C. SECTION 1983 FOR VIOLATION OF EQUAL PROTECTION**

29. SRQ re-alleges and incorporates by reference paragraphs 1 through 28 as if fully set forth herein.

30. This is an action for damages under 42 U.S.C. Section 1983 resulting from the Authority's unequal treatment of SRQ and the TNCs and its consequent violation of SRQ's right to equal protection under the U.S. Constitution.

31. The Authority has violated SRQ's right to equal protection under the law by engaging in disparate treatment of SRQ which is similarly situated to the TNCs. The Violations detailed above evidence specific instances of the Authority's unequal and unconstitutional treatment of SRQ and the TNCs.

32. The Authority acted intentionally and with callous disregard for SRQ's clearly established constitutional rights and as has ignored SRQ's requests to end the unconstitutional Violations.

33. As a direct and proximate result of the Authority's infringement of SRQ's constitutional rights, SRQ has incurred damages and loss in the form lost profits, lost opportunities and lost customers resulting in the virtual destruction of SRQ's business model, as well as attorneys' fees and other costs.

WHEREFORE, SRQ requests that this Court enter judgment against the Authority for damages, attorneys' fees, and costs, under 42 U.S.C. Sections 1983 and 1988 and such further relief as this Court deems just and proper.

## COUNT II- PERMANENT INJUNCTION UNDER 42 U.S.C. SECTION 1983 FOR VIOLATION OF EQUAL PROTECTION

34. SRQ re-alleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein

35. This is an action under 42 U.S.C. Section 1983 to enjoin the Authority from allowing the Violations to continue and not equally applying and enforcing its Rules against the TNCs and SRQ. The purpose of the requested permanent injunction is to prohibit the unconstitutional deprivation of SRQ's right to equal protection under the U.S. Constitution.

36. SRQ will suffer irreparable injury for which there is no adequate remedy at law if the Authority continues to allow the TNCs to engage in the Violations by not equally applying its Rules to those similarly situated to SRQ because doing so infringes SRQ's constitutional right to equal protection. The Authority is permitting the TNCs to circumvent its Rules and exempts them from the restrictions that are nonetheless imposed upon and enforced against SRQ.

37. The TNCs and SRQ provide the same type of on-demand, for hire transportation services at the Airport and are therefore similarly situated. As such, there is no rational basis for the Authority's refusal to enforce its Rules against the TNCs.

38. SRQ has a clear legal right under the U.S. Constitution to have a permanent injunction issued to prevent the Authority from engaging in the Violations because the Authority is concurrently forcing SRQ to follow its Rules while allowing the TNCs to circumvent its Rules.

39. SRQ has no adequate remedy at law to prevent the Authority from continuing to allow the TNCs to engage in the Violations and deny SRQ equal protection under the Rules. The

Authority must be enjoined from doing so to protect SRQ's right to equal protection under the law.

40. Injunctive relief also serves the public's interests because many of the Violations are of Rules designed to protect the health, welfare and safety of the public, i.e. insurance requirements, vehicle inspections and driver licensing. Therefore, the public is being harmed by the Violations and the Authority's unequal enforcement of those Rules against SRQ and in favor of the TNCs. Accordingly, the Authority should be enjoined from doing so.

WHEREFORE, SRQ respectfully request this Court immediately enter a permanent injunctive prohibiting the Authority unequally applying its Rules and from allowing TNCs to operate in violation of its Rules to the detriment of the riding public and for all such other relief as is just and proper.

## <u>COUNT III- BREACH OF CONTRACT</u>

41. SRQ realleges and incorporates allegations in paragraphs 1 through 33 as if fully set forth herein.

42. Pursuant to the On-Demand Concession Agreement, the Authority granted SRQ the exclusive right to operate for-hire, on-demand transportation services at the Airport and granted SRQ certain rights and privileges associated with this arrangement.

43. The Authority has breached the Agreement by, *inter alia*:

a. allowing TNCs to operate for-hire, on-demand transportation services at the Airport;

b. refusing to allow SRQ's vehicles to queue in areas that it currently allows TNCs to queue and pick up passengers in violation of Section 4.2 of the Concession Agreement;

c. allowing TNCs to engage in "solicitation" of passengers while at the Airport terminal complex; and

d. allowing the TNCs to operate with the enumerated Violations.

44. The Authority has also violated its obligation to deal with SRQ fairly and in good faith given that it allows the TNCs to engage in the Violations while requiring SRQ to strictly comply with its Rules.

45. As a result of the Authority's breaches of the On-Demand Concession Agreement, SRQ has incurred damages and losses in the form lost profits, lost business customers, the virtual destruction of SRQ's business together with its concomitant losses, as well as attorneys' fees and other costs.

46. According to the On Demand Concession Agreement and section 57.105, *Florida Statutes*, SRQ is entitled to an award of its attorneys' fees and costs in pursuing this action.

WHEREFORE, SRQ requests that this Court enter judgment against the Authority for damages, attorneys' fees, prejudgment interest, costs, and such further relief as this Court deems just and proper.

## COUNT IV- TORTIOUS INTERFERENCE WITH CONTRACTS

47. SRQ re-alleges and incorporates by reference paragraphs 1 through 33 above as if fully set forth herein.

48. As set forth above, SRQ has entered into numerous Driver Agreements with its drivers and owner-operators who provide SRQ's on-demand, for hire transportation services at the Airport. These Driver Agreements were advantageous to SRQ.

49. By refusing to equally enforce its Rules and allowing the TNCs to engage in the Violations, the Authority has intentionally and unjustifiably interfered with the Driver Agreements.

50. The Authority's actions have caused some of SRQ's drivers and owner/operators to abandon or breach their Driver Agreements. The abandonment and breaches of the Driver Agreements are the result of the Authority's inaction against the TNCs to stop the Violations which has damaged and/or destroyed SRQ's business and caused it severe economic losses.

51. SRQ has suffered damages resulting from the Authority's unjustified and intentional interference in the Driver Agreements.

WHEREFORE, SRQ requests that this Court enter judgment against the Authority for damages, attorneys' fees, prejudgment interest, costs, and such further relief as this Court deems just and proper..

Dated this 3 day of March, 2017.

MILLS PASKERT DIVERS

E.A. "SETH" MILLS, JR., ESQ.
Florida Bar No. 339652
smills@mpdlegal.com
JORDAN MILLER, ESQ.
Florida Bar No. 69998
jmiller@mpdlegal.com
100 North Tampa St., Suite 3700
Tampa, FL 33602
Telephone: (813) 229-3500
Facsimile: (813) 229-3502
*Attorneys for SRQ Taxi Management, LLC*

srq SARASOTA BRADENTON INTERNATIONAL

# EXHIBIT C

## GROUND TRANSPORTATION OPERATING RULES & REGULATIONS

### Section 1
### Introduction

The Sarasota Manatee Airport Authority has established Ground Transportation Operating Rules and Regulations (hereafter Rules and Regulations) for all commercial vehicle companies operating at the Sarasota Bradenton International Airport. These Rules and Regulations are to ensure the most fair and consistent ground transportation service. It will provide the public with the safest and most convenient passenger movement.

It is imperative that all commercial vehicle operators abide by these Rules and Regulations. Commercial vehicle operators are subject to on site supervision and direction by any personnel so designated by the Authority or its authorized representative. Any person who violates these Rules and Regulations will, at the discretion of the Authority or its authorized representative, be denied use of the Airport and its facilities.

The Authority reserves the right to change these Rules and Regulations at any time, for any reason and any respect. Commercial vehicle operators will be notified of any changes in these Rules and Regulations by the issuance of either revised pages for this document or separate directives.

Any regulations or parts of regulations specifically relating to commercial vehicles at the Airport, that are in conflict with these regulations, are hereby superseded by these regulations, but only to the extent of the conflict.

### Section 2
### Definitions

Unless specifically defined otherwise herein, or unless a different meaning is apparent from the context, the terms used in these Rules and Regulations shall have the following definitions:

**Airport** - shall mean Sarasota Bradenton International Airport, located in Sarasota and Manatee Counties, Florida.

**Airport Circle** - shall mean the roadway circling the public parking lots and passing in front of the terminal building.

**Authority** - shall mean the Sarasota Manatee Airport Authority, a special district created by the Legislature of the State of Florida, pursuant to Chapter 2003-309, Laws of Florida as amended, which owns and operates the Airport .

**Arrival Flight Time** - The actual time the flight lands at the Airport.

**Arriving Passenger** - shall mean any person who arrives at the Airport by way of a flight.

**Commercial Vehicle** - shall mean all vehicles where compensation from the passenger or the expectation of compensation or tip from the passenger, is provided in exchange for transportation. Commercial Vehicles for hire include:

- Courtesy vehicles provided at no charge by hotels, motels, rental car companies, etc. for the convenience of their patrons.
- Baggage Delivery Service: vehicles used for the exclusive purpose of carrying baggage to/from the airport; no passengers may be carried.
- Buses: vehicles over 25 feet, seating capacity of more than 15.
- Limousines and Sedans: non metered vehicle, less than 25 feet in length, seating capacity of 14 or less.
- Taxicabs: fares determined by meter, less than 25 feet in length, seating capacity of 6 or less.
- Vans/Shuttles: non metered vehicle, less than 25 feet in length, seating capacity of 15 or less, used for single or multi-passenger pickups for one or more destinations.
- Transportation Network Companies (TNC's): personal vehicles operated by drivers partnered with a TNC.

**Commercial Vehicle Queuing Area** - shall mean the three lanes on the West end of the terminal building which are specifically designated for passenger pick up by commercial vehicles except for TNC's.

**Cruising** - shall mean the repetitive circling of the airport access roads for advertisement or to attract potential unauthorized pickups.

EXHIBIT A

**Departing Passenger** - shall mean any person who is leaving the Airport by way of a flight.

**Driver** - shall mean any person who drives or is in actual physical control of a vehicle on a roadway, parking lot or any other location on Airport property; or one who is exercising control of a vehicle or steering a vehicle being towed by another motor vehicle.

**Flight** – shall mean a trip made by or in an airplane.

**Ground Transportation Permit** - shall mean an authorization by the Authority or its representative to conduct commercial ground transportation activities at the Airport.

**Ground Transportation Operating Rules and Regulations** - shall mean all procedures, rules, and regulations established by the Authority or its representative, relating to commercial ground transportation activities.

**Non-Tenant Car Rental** - shall mean any individual or company engaged in the business of renting or leasing passenger vehicles to passengers using the Airport that does not have a tenant concession agreement in effect with the Authority. The operation of shuttle vehicles shall be governed by these Rules and Regulations; however, non-tenant car rental organizations must also comply with all provisions of the Non Tenant Rental Car Business Permit.

**One-time Pickup Authorization** – shall mean an authorization by the Authority or its representative for Operators not regularly operating at the Airport to pick up pre-arranged passengers on a one-time basis on a specified date.

**Operator** - shall mean any company or person engaged in any type of commercial ground transportation service.

**Park** - shall mean to put or leave or let a motor vehicle stand or stop in any location, whether the driver thereof leaves or remains in the vehicle.

**Permit Sticker** - shall mean an Authority approved sticker to be affixed to a vehicle. This sticker shall have a number and permit year printed on it.

**Solicitation or "to solicit"** - shall mean to directly or indirectly, actively or passively, openly or subtly, ask, request, seek, or try to obtain the purchase, sale, lease or exchange of goods or services, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services, or any form of paid advertising.

**Transportation Network Company (TNC)** – shall mean a company that uses an online-enabled platform to connect passengers with drivers using their personal vehicles.

## Section 3
## Operating Rules And Regulations

### 3.1 Conditions Of Commercial Vehicles And Drivers

3.1.1 All commercial vehicles serving the Airport shall be of high quality, ten (10) years in age or newer, properly maintained in an excellent state of repair and operated in a clean, safe, and businesslike manner as determined by the Authority or its authorized representative. Vehicles older that ten (10) years and in excellent condition may apply for a temporary one (1) year waiver of restriction, which may be provided at the sole discretion of the Authority after a physical inspection by Properties Dept. staff.

3.1.2 All commercial vehicles shall be properly identifiable with company name and/or logo on the outside of the vehicle to enable passengers to identify the company name. Posting of company name and/or logo on license plates or in other discrete locations is acceptable.

3.1.3 All commercial vehicles shall be validly registered with the Florida Department of Motor Vehicles.

3.1.4 All drivers operating commercial vehicles at the Airport shall be clean and neat in their personal appearance and shall be courteous to passengers loading or unloading at the Airport.

3.1.5 All personnel of the Operator shall be properly licensed and adequately trained.

3.1.6 The Operator shall provide the Authority with adequate evidence of the fact that it carries Automobile Liability insurance with a reputable insurance company or companies in such amounts as are required for valid operation under all state or local laws or under permit with Authority, with specific coverage or endorsement making such insurance applicable to its operations at the Airport.

3.1.7 Vehicle insurance shall cover all automobiles owned, leased, hired, rented, borrowed or otherwise used by or on behalf of the Operator and an endorsement shall require that the Authority be named as additional insured and the Authority shall be notified thirty (30) days prior to cancellation or non-renewal of said endorsement.

3.1.8 The Operator shall have available inside each vehicle a listing of current rates for viewing upon request of the passenger. In addition, a certificate of insurance or other verification of vehicle insurance must be carried within the vehicle and produced upon request.

3.1.9 Failure to abide by the above regulations may result in driver's Airport operating privileges being revoked at the discretion of the Authority or its authorized representative.

## 3.2 Regulations And Licenses

3.2.1 The Operator shall comply with all applicable local, state and federal laws and regulations and to abide by the rules and regulations of the Authority now in effect, or that may be promulgated from time to time, including but not limited to the utilization of commercial vehicle queuing areas, and other such traffic control arrangements as designated by the Authority. The Operator will provide the Authority with current copies of all applicable licenses from state or local authorities for areas the Operator proposes to serve.

3.2.2 The Operator shall secure and pay the costs of all required licenses, supplementary equipment, permits, and franchises, both of its employees and vehicles. The Operator will pay all taxes, fees, licenses, and moneys required by the Federal, state, or local governments for its operations at the Airport.

3.2.3 The Operator shall maintain and operate its service in compliance with all requirements imposed pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary, and Part 21 Nondiscrimination in Federally Assisted Programs of the Department of Transportation-Effectuation of Title 6 of the Civil Rights Act of 1964, as said regulations may be amended.

## 3.3 Access And Parking

3.3.1. Commercial vehicles may use those lanes of Airport Circle that are closest to the main terminal building for departing passengers only. Commercial vehicles stopping at the curbside of the Airport's terminal building shall be restricted specifically to active unloading of passengers and their baggage. No pickup or parking shall be allowed in this area. Baggage delivery service vehicles must use the commercial vehicle queuing area for both loading and unloading baggage. Commercial vehicles in violation of this rule may be cited and towed away in accordance with Florida State Statute 316-1945. Commercial vehicles not having a Ground Transportation Permit with the Authority are authorized to enter Airport property only to discharge passengers in accordance with this paragraph.

3.3.2 All commercial vehicles desiring to pick up passengers must obtain a Ground Transportation Permit and display the Authority approved permit sticker in the lower left corner of the front windshield for access to the commercial queuing area (County Transit Authority buses are exempt from this requirement). Authorized commercial vehicles entering the Airport without passengers shall access the commercial vehicle queuing area via the outside lane of Airport Circle or from US Highway 41/General Spaatz.

3.3.3 Passenger pickup by commercial vehicles other than TNC's is permitted only in the commercial vehicle queuing area. Pickups by Operators other than Taxicab Concession Operator may be made on a prearranged basis only. Pickups of celebrities and politicians who wish to remain anonymous may be arranged by contacting the Airport Police in advance of the date of the pickup

3.3.4 Commercial vehicles not regularly operating at the Airport that have a pre-arranged passenger pick up scheduled on a specified date may request a One Time Pickup Authorization for a one-time fee of $35.00. This authorization must be requested in advance of the pickup date and evidence of insurance must be provided by the Operator. Sedans and limousines must use the paid parking lot and charter/tour buses must use lane 3 of the queuing area. If passenger pickups become regular, a Ground Transportation Permit will be required.

3.3.5 Parking in the commercial vehicle queuing area is designated as follows:

Lane 1 - Taxicab Concession Operator Only

Lane 2 – Commercial vehicles other than buses and TNC's

Lane 3 – Buses Only (vehicles over 25 feet, carrying more than 15 passengers)

3.3.6 Authorized commercial vehicles except for TNC's shall enter the commercial vehicle queuing area only for the purpose of loading customers or passengers.

3.3.7 Parking in lanes 2 and 3 of the commercial vehicle queuing area shall be limited to 30 minutes.

3.3.8 Vehicles may not be left unattended in the commercial vehicle queuing area unless the driver contacts the Airport Police Department to inspect their vehicle. Upon clearance by the police officer, the driver may enter the airport terminal to meet arriving passengers at the designated area near the down escalator. Drivers may hold a small sign (no more than 81/2" x 11") with the prearranged passenger's name.

## 3.4 Miscellaneous Provisions

3.4.1 The Operator shall repair promptly, and at no cost to the Authority, any damages to property of the Authority which have been caused by the Operator or its representatives.

3.4.2 No signs (except as designated in Section 3.3.8), posters or similar devices shall be erected, displayed, or maintained by the Operator on Airport premises without prior written approval of the Authority or its authorized representative.

3.4.3 Solicitation of business in any manner whatsoever upon Airport property is strictly prohibited. Cruising is specifically prohibited.

3.4.4 The Authority or its representatives shall have the right to restrict drivers from operating at the Airport who do not comply with these Rules and Regulations or orders from authorized Authority representatives.

3.4.5 Unauthorized commercial vehicles operating on airport property may be cited by the Airport Police in accordance with Florida Statutes.

3.4.6 Special events (tours, etc.) should be coordinated through the Properties Department.

3.4.7 Permittee shall not cause or permit to occur upon any portion of the Airport any illegal waste, any public or private nuisance, or any other act or thing which may disturb the quiet enjoyment of any other tenant, licensee, invitee, or person using or occupying any portion of the Airport.

3.4.8 This permit is personal to Permittee and Permittee may not assign, transfer, license, convey, or sell this Permit, or any rights of Permittee hereunder, whether voluntarily or by operation of law without the prior written approval of Authority.

SARASOTA
BRADENTON
INTERNATIONAL

# CONCESSION AGREEMENT
# ON-DEMAND METERED TAXICAB & NON-METERED LIMOUSINE SERVICE

**Concessionaire**

DIPLOMAT AIRPORT TRANSPORTATION, INC.

**Authority**

SARASOTA MANATEE AIRPORT AUTHORITY

Date of Execution: June 18, 2009
Initial Term:________________

EXHIBIT
B

# TABLE OF CONTENTS


| Article | | Page |
|---|---|---|
| 1 | Term of Agreement | 1 |
| 2 | Concession Fee | 2 |
| 3 | Security for Payment | 2 |
| 4 | Non-Exclusive Rights | 3 |
| 5 | Operating Standards | 4 |
| 6 | Vehicle Parking Spaces | 7 |
| 7 | Signs, Advertising and Solicitation | 7 |
| 8 | Insurance | 8 |
| 9 | Indemnification | 9 |
| 10 | Termination Rights of the Authority | 10 |
| 11 | Concessionaire's Right of Cancellation | 11 |
| 12 | Authority's Right to Alter or Repair Airport Facilities | 11 |
| 13 | Assignment | 11 |
| 14 | Corporate Tenancy | 12 |
| 15 | Compliance with Laws, Regulations, Ordinances, Rules | 12 |
| 16 | Taxes, Permits, Licenses | 13 |
| 17 | Environmental Regulations | 13 |
| 18 | Non-Discrimination | 13 |
| 19 | Affirmative Action | 14 |
| 20 | Disadvantaged Business Enterprise | 14 |
| 21 | Americans with Disabilities Act | 15 |
| 22 | Primary Lien of Authority | 15 |
| 23 | Attorney's Fees and Costs | 15 |
| 24 | Invalidity of Clauses | 15 |
| 25 | Subordination of Bond Resolution | 15 |
| 26 | Federal Right to Reclaim | 15 |
| 27 | Rights Reserved to the Authority | 16 |
| 28 | Remedies Cumulative | 16 |
| 29 | Notices and Communications | 16 |
| 30 | Miscellaneous | 16 |

Exhibit A – Rates and Charges to Customers
Exhibit B – Sworn Statement on Public Entity Crimes
Exhibit C – Ground Transportation Operating Rules and Regulations

# CONCESSION AGREEMENT FOR ON-DEMAND METERED TAXICAB & NON-METERED LIMOUSINE SERVICE

THIS CONCESSION AGREEMENT (hereinafter referred to as the "Agreement") made and entered into this _____ day of ________________, 2009, by and between the SARASOTA MANATEE AIRPORT AUTHORITY, a body corporate and politic (hereinafter referred to as the "Authority") and DIPLOMAT AIRPORT TRANSPORTATION, INC., a corporation organized under the laws of the State of Florida and authorized to conduct business in Florida (hereinafter referred to as "Concessionaire").

**WITNESSETH:**

WHEREAS, the Authority is the owner and operator of the Sarasota Bradenton International Airport (hereinafter referred to as "Airport"); and

WHEREAS, the Authority wishes to assure that safe, high quality and efficient metered taxicab and non-metered limousine (hereafter "taxi/limo") service is available at the Airport to meet all arriving flights for the benefit and convenience of the traveling public and has determined that contracting with a taxi/limo service is essential to assure that service is available; and

WHEREAS, Concessionaire is a qualified operator of such a service and is desirous of furnishing taxi/limo services at the Airport; and

WHEREAS, the Authority is willing to grant non-exclusive rights to Concessionaire for such purposes, subject to certain conditions and restrictions hereinafter specifically set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the Authority and Concessionaire agree for themselves, their successors and assigns as follows:

## ARTICLE 1
## Term Of Agreement

### 1.1 Term

Subject to the covenants, terms, conditions and restrictions hereinafter set forth, the Authority hereby grants to Concessionaire the non-exclusive right to conduct an on-demand, combination metered taxicab and non-metered limousine service for the purpose of transporting airline passengers, with or without baggage, from the Airline Passenger Terminal Building ("Terminal") for an initial period commencing September 1, 2009, and terminating on August 31, 2014.

### 1.2 Option

The Authority shall have the option, at its sole discretion, to renew this Agreement, upon the same terms and conditions, for an additional five (5) year period, at the end of the initial term. If this option is exercised, the Concession Fee shall be renegotiated for the extended term. In the event the Authority exercises its right to renew, Authority shall so notify Concessionaire by providing written notice to Concessionaire not less than ninety (90) days prior to the termination date of the initial term.

## ARTICLE 2
## Concession Fee

### 2.1 Concession Fee

Commencing upon the effective date hereof, Concessionaire shall pay to the Authority, for the privileges and rights granted in this Agreement, a concession fee of six cents ($0.06) per deplaned passenger as reported by Authority. Concessionaire shall pay two thousand dollars ($2,000.00) in advance each month during the term of this agreement. When each month's deplaned passenger number becomes available, the Authority will invoice Concessionaire for additional fee or credit for that month's deplaned passengers.

### 2.2 Delinquent Payments

In the event Concessionaire fails to pay fees or charges as required to be paid under provisions of this Agreement within ten (10) days after the earliest due date, interest at the maximum rate allowed by law shall accrue against the delinquent payment(s) from date due until the date payment is received by Authority. Implementation of this provision shall not preclude the Authority from terminating this Agreement for default in the payment of fees and charges or from enforcing any other provisions contained herein or implied by law

### 2.3 Worthless Check or Draft

In the event Concessionaire delivers a worthless check or draft to the Authority in payment of any obligation arising under this Agreement, Concessionaire shall incur a service charge of Twenty Dollars ($20.00) or five percent (5%) of the face amount of such check, whichever is greater; or if Florida Statute §832.07 is amended, such other fee as shall be set by said statute.

Authority shall not accept more than one worthless check during any twelve month period during the term of this agreement. Upon receipt of a second worthless check during any twelve month period. Authority thereafter shall only accept cashier's checks for the concession fee for the next twelve months.

### 2.4 Revenue Payments

The Concessionaire shall pay all fees, charges and billings required under this agreement to the following address:

Sarasota Manatee Airport Authority
Attn: Accounts Receivable
6000 Airport Circle
Sarasota, FL 34243

All reports and other correspondence should be addressed as indicated in the Article hereof entitled "Notices and Communications."

## ARTICLE 3
## Security For Payment

### 3.1 Security for Payment

To provide security for the fees, charges, and performance required hereunder. Concessionaire shall comply with either of the following two (2) options:

A. Post with Authority a surety bond to be maintained throughout the term of this Agreement in an amount of Twenty-four Thousand Dollars ($24,000). Such bond shall be issued by a surety Concessionaire acceptable to the Authority and authorized to do business in the State of Florida and shall be in the form and content prescribed by the Authority; or
B. Deliver to Authority an irrevocable letter of credit drawn in favor of the Authority upon a bank which is satisfactory to the Authority and which is authorized to do business in the State of Florida. Said irrevocable letter of credit shall be in an amount of Twenty-four Thousand Dollars ($24,000), and shall be kept in force throughout the term of this Agreement in the form and content prescribed by the Authority.

**3.2 Refund of Security for Payment**

The refund of the surety bond or irrevocable letter of credit required pursuant to this Article 3 shall be conditioned on the satisfactory performance of all terms, conditions, and covenants contained herein throughout the entire term of this Agreement. If this Agreement is terminated earlier, the bond or irrevocable letter of credit will not be refunded.

**3.3 Failure to Maintain Security for Payment**

Failure to maintain a security for payment in the form of either a surety bond or an irrevocable letter of credit shall constitute default and Authority may immediately terminate this Agreement and Concessionaire's rights, privileges, and obligations hereunder.

## ARTICLE 4
## Non-Exclusive Rights

**4.1 Concessionaire's Rights**

Concessionaire shall have the non-exclusive right to conduct a combination metered taxicab and non-metered limousine operation for the purpose of transporting airline passengers and baggage from the Terminal and will furnish and operate at all times sufficient and suitable taxicabs and limousines to maintain adequate service required by Airport patrons. Concessionaire may also provide delivery of delayed, misplaced, or misrouted airline baggage at the request of the airlines.

**4.2 Queuing Area and Starter Counter**

Concessionaire shall be granted the right to pick up its customers in the first (inside) lane of the ground transportation queuing area or other areas as authorized by the Authority. Concessionaire shall also have the use of the Starter Counter area at the west end of the baggage wing.

**4.3 Authority's Right to Permit Other Ground Transportation**

Such rights herein granted Concessionaire do not prevent the Authority from permitting other methods of passenger ground transportation, as for example rental cars, limousines, buses or private passenger cars not for hire.

A. The Authority reserves the right to authorize properly identified hotel, motel and rental car concessionaire courtesy cars operating on a not for hire basis to pick up their customers in the second lane of the ground transportation queuing area.

B. The Authority reserves the right to permit other properly marked, licensed taxicabs and limos to pick up passengers who have made specific advance reservations for such pick-ups.

C. The operations of such hotel, motel and rental car concessionaire courtesy cars, taxicabs and limos with advance reservations will not be permitted to engage in any solicitation of passengers at the terminal complex.

D. In specific instances where an airline flight is unable to proceed to its ultimate destination due to inclement weather, flight cancellations or flight irregularities, the airlines will have the right to secure such ground transportation as may be required to transport their passengers without infringing upon rights of Concessionaire.

E. It is further understood between the parties that it is the intention of the Authority to permit municipal buses serving the general public to enter the premises of the Airport for the purpose of picking up and discharging passengers.

## ARTICLE 5
## Operating Standards

### 5.1 General Standards

The standards of operation, as pertain to the service afforded to the public, shall be equal to or exceed the highest quality of service rendered by similar concessions at other airports in the United States. At all times the public shall be given the highest consideration in matters affecting the operation and use of the Airport.

Concessionaire shall furnish good, prompt, and courteous service, adequate to reasonably meet all reasonable demands for on demand taxi/limo service at the Airport, including the providing of service to persons with disabilities consistent with state and federal law. Concessionaire shall maintain close supervision over all employees to ensure maintenance of a high quality of service and courtesy to the public, and prudent, safe use of the Airport roadway system. Concessionaire shall, within reason, control the conduct, demeanor and appearance of its employees, invitees, and of those doing business with it and, upon objection from Authority concerning the conduct, demeanor and appearance of any such persons, shall immediately take all reasonable steps necessary to remove the cause of objection. The performance or nonperformance of all obligations stated in this paragraph is to be determined at the sole discretion of Authority.

### 5.2 Availability of Service

Concessionaire shall promptly furnish adequate taxi/limo service at all times during the day and night as may be required by passenger demand and as any certified passenger airline doing business at the Airport may from time to time reasonably request. Concessionaire shall provide taxi/limo service from the earliest scheduled air carrier arrival through the last scheduled arrival during any calendar day, each and every day of each year, throughout the term hereof.

### 5.3 Sole Business at Airport

The use of the Airport's facilities and property by Concessionaire, its agents or employees shall be limited solely to the purpose set forth by this Agreement. The Concessionaire, its agents or employees shall not conduct any business nor provide any service to the public other than that of taxi/limo service or the delivery of delayed, misplaced, or misrouted airline baggage without prior written consent of the Authority.

### 5.4 Rates and Charges to Customers

Concessionaire covenants and agrees that all rates and charges to customers will be in accordance with rates set by ordinance of the City of Sarasota or other governmental authority having jurisdiction over such rates. Taxicab rates shall be computed by taximeters which are approved and sealed by the State. Rates for non-metered limousines shall approximate those charged in metered taxicabs. A copy of the rates schedule shall be posted in each limousine in plain view of passengers. Rates charged from the Airport shall be consistent within Sarasota County and Manatee County.

### 5.5 Questions/Complaints

Any questions or complaints regarding the level of service, appearance and maintenance of the vehicles or standards of operation or public safety brought before the Authority shall be reviewed by the Authority who shall take such actions as deemed appropriate in the particular circumstance. Upon notification, Concessionaire shall take whatever steps are necessary to comply with the directive of the Authority. Continued or repeated violations of a directive shall be suitable grounds for the termination of this Agreement.

Concessionaire shall promptly and courteously respond to customer complaints made directly to Concessionaire by the customer or made to the Authority and referred by the Authority to Concessionaire. A record of all such complaints shall be maintained by Concessionaire throughout the term of this Agreement. Concessionaire shall, within three (3) calendar days of the date a written customer complaint is first received, whether referred by the Authority or received directly from the customer, make an appropriate written response if requested by the customer. If further action on the complaint is required, the initial response may consist of an acknowledgment of the complaint and a statement of further action or investigation to be taken by Concessionaire. When such further action or investigation is complete, a follow-up response will be sent to the customer. Customer complaints which are received by telephone are to be responded to immediately by telephone and, if appropriate, in writing. Concessionaire shall submit to the Authority a copy of each complaint report prepared by Concessionaire and Concessionaire's written response to or record of telephone discussions with the customer to resolve such complaints.

Each taxicab will display in plain view of the passenger an information card with driver's name, picture and ID# on it along with the following message which may be changed from time to time at the sole discretion of the Authority:

> ***"Welcome to the Sarasota Bradenton International Airport. We hope your stay is pleasant. Uniformed Taxi Starters and Airport Police Officers are on duty to assist you. Complaints and/or compliments should be sent to the Director, Properties, Sarasota Manatee Airport Authority, 6000 Airport Circle, Sarasota, Florida 34243.***
>
> ***Please note the driver's name, taxicab number and the date and time of your trip in your correspondence.***
>
> ***Your comments are important to us."***

**5.6 Starters**

Concessionaire shall furnish, at its own expense, the necessary starters to suitably and efficiently provide taxi/limo service to the public. Concessionaire shall provide Starter with a communications system to communicate with drivers. Starters shall be on duty prior to the first scheduled air carrier arrival of the day until the last scheduled arrival and its passengers have exited the Terminal and Baggage Claim areas. Starters shall be neat and courteous at all times and shall advise, upon request, alternate methods of ground transportation. A rate schedule shall be posted in plain view at the Starter's booth. Maximum waiting time for passengers shall not exceed 10 minutes from the time a customer requests the service until the vehicle is loaded and departs the airport. A direct telephone line shall be installed by Concessionaire at the Starter Booth for customer use when Starter is not available.

**5.7 Trip Logs**

Driver's logs shall be made available upon request of Authority.

**5.8 Vehicle Standards**

Concessionaire shall provide all equipment, including vehicles, necessary for the operation of this concession.

A. Definitions:

   Taxicab: metered vehicle, less than 25 feet in length, seating capacity of 6 or less
   Limousine: non-metered vehicle, less than 25 feet in length, seating capacity of 15 or less; may include sedans, stretch vehicles or vans.

B. Concessionaire's vehicles shall be modern, less than 10 years old, air conditioned, suitable in size and design, uniformly painted, well maintained both inside and outside (including but not limited to no visible damage such as torn, stained or faded upholstery or carpeting, dents, scratches, rust,

faded or peeling paint, broken or cracked windows, broken or non-working headlights and taillights, loose or damaged bumpers), clean and sanitary.

C. Concessionaire's vehicles shall be safe for operation and in compliance in all respects with the applicable state and local laws, including having a City of Sarasota Public Vehicle Permit.

D. All taxicabs and limousines shall be radio equipped for communications with the Starter and Dispatcher.

E. The Authority or its designee shall, at any reasonable time, have the right to inspect Concessionaire's taxicabs and limousines.

F. Any taxicab or limousine found to be in violation of the above may be refused permission to operate at the Airport pursuant to this Agreement; provided further, if any taxicab or limousine is wrecked or damaged, it shall not be operated until it is repaired.

G. Concessionaire is permitted to use owner-operated vehicles. Owner-operated vehicles must comply with all terms and conditions of the Agreement, and the Authority shall have the right to prevent any current or future owner-operated vehicle from operating at the Airport for cause and upon receipt of written notice to Concessionaire.

**5.9 Disabled Passenger-Accessible Vehicles**

Concessionaire shall ensure that at least one (1) appropriately equipped vehicle is readily available to the Airport for purposes of transporting disabled persons. Such vehicles shall be operated by an appropriately trained driver. In the event that the assigned vehicle is in use, the Concessionaire shall use its other resources available to ensure that service for transportation of disabled persons is readily available. The provisions of this section are in addition to (and not a limitation of) any other requirements that may be imposed by applicable federal, state or local laws or regulations, including without limitation, the Americans with Disabilities Act of 1990 and Title IV Code of Federal Regulations, Parts 17 and 37.

The Concessionaire agrees that it shall provide assistance to passengers who are using wheelchairs, when such passengers are entering and exiting the Disabled Passenger Vehicles or other Concessionaire provided vehicles.

**5.10 Concessionaire's Employees**

Concessionaire's employees (including drivers, starters and other employees) shall adhere to the following standards:

A. While operating under this agreement, Concessionaire shall keep an updated list of drivers verifying the following qualifications for each driver and shall provide Authority with a copy upon request:
   1. The driver is at least 18 years of age.
   2. The driver is legally authorized to work in the United States.
   3. The driver holds a valid driver's/operator's license issued by the State of Florida.
   4. The driver maintains a public vehicle driver's license issued by the City of Sarasota.
   5. The driver speaks and understands English.

B. Only Concessionaire's starters may engage in the practice of solicitation of customers.

C. Concessionaire's employees shall not use improper, loud, or boisterous language.

D. Concessionaire's employees shall be clean, neat in appearance, courteous at all times, and be appropriately attired in uniforms with an ID badge identifying Concessionaire's name and employee's name.

E. Drivers shall remain within ten (10) feet of their respective vehicles whenever said vehicles are on the line and shall not enter the Terminal, except for brief periods of time to patronize the

concession facilities or public rest rooms nearest to the taxi/limo staging area. In no case shall a driver delay other drivers in line.

F. Concessionaire and its employees shall conduct its business and provide taxi/limo services in a manner which will maintain the Airport, inside and outside the Terminal in a clean and attractive condition and shall use proper waste receptacles for accumulated waste.

G. Concessionaire's employees shall accept any and all passengers desiring service regardless of short or long haul destinations. No selection of passengers according to destination shall be permitted at any time.

H. Concessionaire's employees shall not consolidate passengers in taxicabs or limousines unless passenger is informed of any additional charges or savings and passenger's express consent is given.

I. It is understood and agreed between the parties hereto that in the event of a temporary substantial failure of service by Concessionaire, or in the event Concessionaire fails to have a sufficient number of vehicles available and ready for use for loading of passengers desiring transportation, the Authority may, for public convenience, supplement or authorize other companies to provide services until complete service is restored by Concessionaire. Action or substitution or authorization by the Authority shall not be considered as a violation by the Authority of the rights of Concessionaire under this Agreement.

## ARTICLE 6
## Vehicle Parking Spaces

The Authority agrees to provide Concessionaire with adequate parking spaces for Concessionaire's vehicles at suitable and accessible locations adjacent to the baggage claim areas of the Terminal for the loading of passengers and baggage into the vehicles operating under this Agreement. All taxicabs shall be parked in such a manner and in such areas as may be designated from time to time by the Authority.

## ARTICLE 7
## Signs, Advertising And Solicitation

No signs, posters or advertising displays or devices may be erected in or upon any vehicles used by Concessionaire in the performance of this Agreement without prior written approval of the Authority. Concessionaire, its agents or employees are prohibited from distributing any advertising matter except such as shall be first approved in writing by the Authority.

Concessionaire agrees that no solicitations for private business other than that herein provided for shall be carried on at the Airport premises. Any such solicitation, conduct related to, or the administration or supervision of any other type or kind of business except as provided herein shall not be permitted and shall be considered in violation of the provisions of the Agreement.

## ARTICLE 8
## Insurance

During the life of the Agreement, the Concessionaire shall provide, pay for, and maintain with insurance carriers satisfactory to the Authority, the types of insurance described herein. All insurance shall be from responsible companies duly eligible to do business in the State of Florida. All liability policies of the Concessionaire under this Permit shall also provide the Severability of Interest Provision. The insurance coverages and limits required shall be evidenced by properly executed certificates of insurance. The certificate shall be signed by the authorized representative of the insurance company shown in the certificate. The required policies of insurance shall be performable in Sarasota and Manatee Counties, Florida and shall be construed in accordance with the laws of the State of Florida. The Sarasota Manatee Airport Authority shall be named as additional insured on all insurance policies as required herein.

Thirty (30) days' prior written notice by registered or certified mail shall be given the Authority of any cancellation, intent not to renew, or reduction in the policies' coverages except in the application of the aggregate limits provisions. In the event of a reduction in any aggregate limit, the Concessionaire shall take immediate steps to have it reinstated. If at any time the Authority requests a written statement from the insurance Concessionaire as to any impairments to the aggregate limit, the Concessionaire shall promptly authorize and have delivered such statement to the Authority. The Concessionaire shall make up any impairment when known to it. The Concessionaire authorizes the Authority and its insurance consultant to confirm all information furnished the Authority, as to its compliance with its insurance requirements, with the Concessionaire's insurance agents, brokers, and insurance carriers. All insurance coverages of the Concessionaire shall be primary to any insurance or self-insurance program carried by the Authority for this Permit.

The acceptance of delivery to the Authority of any certificate of insurance evidencing the insurance coverages and limits required does not constitute approval or agreement by the Authority that the insurance requirements have been met or that the insurance policies shown in the certificates of insurance are in compliance with the Permit's insurance requirements.

The insurance coverages and limits required of the Concessionaire are designed to meet the minimum requirements of the Authority. They are not designed as a recommended insurance program for the Concessionaire. The Concessionaire alone shall be responsible for the sufficiency of its own insurance program.

If any general liability insurance required herein is to be issued or renewed on a "claims made" form as opposed to the "occurrence" form, the retroactive date for coverage shall be no later than the commencement date of the Permit and shall provide that in the event of cancellation or non-renewal, the discovery period for insurance claims (tail coverage) shall be unlimited.

All of the required insurance coverages shall be issued as required by law and shall be endorsed, where necessary, to comply with the minimum requirements contained herein. Required notices shall be sent to:

Sarasota Manatee Airport Authority
6000 Airport Circle
Sarasota, Florida 34243

Renewal certificates of insurance shall be provided to the Authority a minimum of ten (10) days prior to expiration of current coverages so that there shall be no interruption in the operations of the Concessionaire due to lack of proof of insurance coverages required of the Concessionaire in this Permit.

Concessionaire shall maintain specific types of insurance as follows:

A. Comprehensive General Liability - $1,000,000 combined single limit coverage, comprised of such primary and excess policies of insurance as Concessionaire finds it most feasible to purchase during the term of this Agreement.

B. Automobile Liability - in an amount not less than:

| | |
|---|---|
| Taxicabs: | $125,000 bodily injury per person, |
| | $300,000 bodily injury per occurrence, |
| | $50,000 per accident for property damage. |
| Limousines: | $500,000 Combined Single Limit – less than 6 passengers |
| | $1,000,000 Combined Single Limit – 6 or more passengers |

C. Worker's Compensation – in accordance with the statutes and regulations of the State of Florida, including Employer's Liability.

The Authority specifically reserves the right at its sole discretion to review the type(s) and limit(s) of insurance coverage(s) and to require modification of the type(s) and limit(s) of coverage(s) to be maintained by Concessionaire throughout the term of this Permit. Failure by Concessionaire to maintain the Authority required coverages shall constitute default and Authority may immediately terminate this Agreement and Concessionaire's rights, privileges, and obligations thereunder.

## ARTICLE 9
## Indemnification

Concessionaire agrees to protect, defend, reimburse, indemnify and hold Authority, its agents, employees and elected officers and each of them, free and harmless at all times from and against any and all claims, liability, expenses, losses, costs, fines and damages (including attorney fees) and causes of action of every kind and character against or from Authority by reason of any damage to property or the environment, including any contamination of Airport property such as the soil or storm water by fuel, gas, chemicals or other substances deemed by the EPA to be environmental contaminants at the time this Agreement is executed or as may be redefined by the appropriate regulatory agencies in the future, or bodily injury (including death) incurred or sustained by any agent or employee, and any third party whomsoever, or any governmental agency, arising out of or incident to or in connection with Concessionaire's performance under this Agreement, Concessionaire's use or occupancy of the Premises, Concessionaire's acts, omissions or operations hereunder or the performance, nonperformance or purported performance of Concessionaire or any breach of the terms of this Agreement. Provided, however that Concessionaire shall not be responsible to the Authority for any and all claims, liability, expenses, losses, costs, fines and damages (including attorney fees) and causes of action occasioned solely by any gross negligent or willful misconduct of the Authority, its agents, employees, officers, representatives, and contractors. Concessionaire recognizes the broad nature of this indemnification and hold harmless clause, and voluntarily makes this covenant and expressly acknowledges that it is an express condition of this Agreement. This clause shall survive the termination of this Agreement. Compliance with the insurance requirements as attached hereto shall not relieve Concessionaire of its liability or obligation to indemnify Authority as set forth in this Article.

## ARTICLE 10
## Termination Rights Of The Authority

The service to be provided by Concessionaire hereunder must at all times be satisfactory to the Authority and in accordance with the terms of the Agreement herein stated. Should the Authority deem the service rendered by the Concessionaire hereunder unsatisfactory or not in accordance with the terms of the Agreement, Concessionaire will be notified in writing of the nature of the complaint and shall be afforded ten (10) calendar days thereafter in which to correct the service problems outlined in said notice or risk termination of the Agreement in its entirety. Should Concessionaire fail to remedy said problems stated in the notice, the Authority may immediately terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, said termination shall become effective on the date of termination as stated in the notice. No further notice shall be given and no plea by Concessionaire shall be considered

In addition, the Authority may terminate this Agreement and pursue any damages or remedies available under law upon the happening, or at any time after the happening, of any of the following events of default:

A. Concessionaire's failure to pay the concession fee, or any other sums payable hereunder for a period of ten (10) days after written notice by the Authority;
B. The receipt of two worthless checks in payment of any obligation arising under this Agreement during any twelve-month period of the Agreement term;
C. The failure to maintain a surety bond as required under Article 4, Security for Payment;
D. The failure to maintain the Authority required insurance coverages as required under Article 8, Insurance;
E. Concessionaire's failure to observe, keep or perform any of the other terms, covenants, agreements or conditions of this Agreement or in the Airport Rules and Regulations for a period of ten (10) days after written notice by the Authority:
F. The bankruptcy of Concessionaire:
G. Concessionaire making an assignment for the benefit of creditors;
H. A receiver or trustee being appointed for Concessionaire or a substantial portion of concessionaire's assets;
I. Concessionaire's voluntary petitioning for relief under, or otherwise seeking the benefit of, any bankruptcy, reorganization, arrangement or insolvency law;
J. Concessionaire's vacating or abandoning its operation at the Airport or attempting to mortgage or pledge its interest hereunder;
K. Concessionaire's interest under this Agreement being sold under execution or other legal process;
L. Concessionaire's interest under this Agreement being modified or altered by any unauthorized assignment or subletting or by operation of law;
M. Any of the goods or chattels of Concessionaire used in, or incident to, the operation of Concessionaire's business at the Airport being seized, sequestered, or impounded by virtue of, or under authority of, any legal proceeding;
N. Concessionaire's failure to cooperate with any environmental laws, programs or audits promulgated by the Authority or applicable regulatory agencies which may be revised from time to time.

Pursuit of any remedy herein provided shall not constitute a forfeiture or waiver of any fees or other monies due to the Authority hereunder or of any damages accruing to the Authority by reason of the violations of any of the terms, provisions and covenants herein contained. The Authority's acceptance of fees or other monies following any event of default hereunder shall not be construed as the Authority's waiver of such event of default. No forbearance by the Authority of action upon any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of the terms, provisions and covenants herein contained. Forbearance by the Authority to enforce one or

more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default.

The parties hereto shall, and they hereby do, waive trial by jury in any action, proceeding, or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of, or in any way connected with, this Agreement, the relationship of the Authority and Concessionaire, Concessionaire's use or occupancy of the Airport and/or claim or injury or damage. In the event the Authority commences any proceeding to enforce this Agreement or the Authority/Concessionaire relationship between the parties or for nonpayment of fees (of any nature whatsoever) or additional monies due the Authority from Concessionaire under this Agreement, Concessionaire will not interpose any counterclaim of whatever nature or description in any such proceedings. In the event Concessionaire must, because of applicable court rules, interpose any counterclaim or other claim against the Authority in such proceedings, the Authority and Concessionaire covenant and agree that, in addition to any other lawful remedy of the Authority, upon motion of the Authority, such counterclaim or other claim asserted by Concessionaire shall be severed out of the proceedings instituted by the Authority and the proceedings instituted by the Authority may proceed to final judgement separately and apart from and without consolidation with or reference to the status of each counterclaim or any other claim asserted by Concessionaire.

The parties hereto agree that any and all suits for any and every breach of this Agreement shall be instituted and maintained only in those courts of competent jurisdiction in Sarasota or Manatee Counties, Florida.

## ARTICLE 11
## Concessionaire's Right Of Termination

Concessionaire may terminate this Agreement if Concessionaire is not in default of this Agreement (including, but not limited to, its payments to Authority hereunder) by giving Authority one hundred eighty (180) days' advance written notice. However, this action will cause the Authority to recover the security for payment described in Article 3.1.

## ARTICLE 12
## Authority's Right To Alter Or Repair Airport Facilities

Notwithstanding any provisions of the Agreement to the contrary, the Authority shall have the absolute right to construct a new terminal complex, make repairs, alterations and additions to the existing terminal buildings or areas adjacent to the terminal buildings, or elsewhere on the Airport, free from any and all liability to Concessionaire, for the loss of business or damage of any nature whatsoever to Concessionaire occasioned during the making of such repairs, alterations, additions, or construction of the new terminal complex. The Authority agrees to provide reasonable notice to Concessionaire prior to any planned construction which would impact Concessionaire's operations.

## ARTICLE 13
## Assignment

Concessionaire shall not assign this Agreement, either in whole or in part, without prior written consent of the Authority which consent may be withheld for any reason whatsoever at the sole discretion of the Authority. The Authority reserves the right to investigate the proposed assignee to determine sufficient experience and financial worth to operate the concession. No request for, or consent to, such assignment shall be considered unless Concessionaire shall have paid all fees and charges which have accrued in favor of the Authority and Concessionaire shall have otherwise met all other legal obligations to be performed, kept, and observed by it under the terms and conditions of this Agreement or as this Agreement may be subsequently amended or modified.

## ARTICLE 14
## Corporate Tenancy

If Concessionaire is a corporation, the undersigned officer of Concessionaire hereby warrants and certifies to Authority that Concessionaire is a corporation in good standing and is authorized to do business in the State of Florida. The undersigned officer of Concessionaire hereby further warrants and certifies to Authority that he or she, as such officer, is authorized and empowered to bind the corporation to the terms of this Agreement by his or her signature thereto. Authority, before it accepts and delivers this Agreement, shall require Concessionaire to supply it with a Sworn Statement on Public Entity Crimes, Exhibit B attached hereto and incorporated herein, and a certified copy of the corporate resolution authorizing the execution of this Agreement by Concessionaire. If Concessionaire is a corporation (other than one whose shares are regularly and publicly traded on a recognized stock exchange), Concessionaire represents that the ownership and power to vote the majority of its outstanding capital stock belongs to and is vested in the officer or officers executing this Agreement or members of his, her or their immediate family. If there shall occur any change in the ownership of and/or power to vote the majority of the outstanding capital stock of Concessionaire, whether such change or ownership is by sale, assignment, bequest, inheritance, operation of law or otherwise, without the prior written consent of Authority, then Authority shall have the option to terminate this Agreement upon thirty (30) days' written notice to Concessionaire, furthermore, Concessionaire shall have an affirmative obligation to notify immediately Authority of any such change.

## ARTICLE 15
## Compliance With Laws, Regulations, Ordinances, Rules

Concessionaire shall at all times comply with applicable federal, state and local laws and regulations, and the Airport Rules and Regulations (available at www.srq-airport.com under About SRQ, Operations), all applicable health rules and regulations and other mandates whether existing or as promulgated from time to time by the federal, state or local government, Authority or Airport Management including but not limited to permitted and restricted activities, security matters, parking, ingress and egress, environmental and storm water regulations and any other operational matters related to the operation of the Airport. This shall include, but not be limited to Concessionaire precluding its employees, agents, customers, associates or invitees from entering upon any restricted area of the Airport as noted in procedures, rules or regulations of Authority or the Department of Homeland Security. In addition to other remedies provided hereunder, any violation of Airport or Department of Homeland Security procedures regarding security shall subject Concessionaire to an administrative damages payment of $500 (in consideration for the administrative processing required by Authority to process and to respond to a violation) and to damages equal to the greater of (1) one thousand dollars ($1,000) per occurrence (in consideration for damages which might be suffered by Authority in the form of fines or administrative procedures resulting from such violation), or (2) the civil fine imposed by the Department of Homeland Security upon Authority as a result of the violation. This amount must be paid by Concessionaire within ten (10) days of written notice or the Permit may be terminated by the Authority. The Authority, before it accepts and delivers this Permit, shall require Concessionaire to supply it with a Sworn Statement on Public Entity Crimes, Exhibit B attached hereto and incorporated herein.

**ARTICLE 16**
**Taxes, Permits, Licenses**

Concessionaire shall bear, at its own expense, all costs of operating its equipment and business including any and all taxes assessed against the operation of the concession and any sales, use or similar taxes levied or assessed on any payments made by Concessionaire hereunder. Concessionaire shall obtain at its own expense all permits, licenses, or other authorizations required by authority of law in connection with the operation of its business at the Airport.

**ARTICLE 17**
**Environmental Regulations**

Notwithstanding any other provision of this Agreement, Concessionaire acknowledges that certain properties and use of properties within the Airport are subject to environmental regulations. Concessionaire agrees to observe and abide by said regulations as applicable to its use of the Airport, and in addition to any and all other Agreement requirements, and any other covenants and warranties herein, Concessionaire hereby expressly warrants, guarantees, and represents to Authority, upon which Authority expressly relies, that Concessionaire is aware of federal, state, regional and local governmental laws, ordinances, regulations, orders and rules, without limitation, which govern or which apply to the direct or indirect results and impacts to the environment and natural resources due to, or in any way resulting from, the conduct by Concessionaire of its operations pursuant to or upon the Premises. Concessionaire expressly represents, covenants, warrants, guarantees, and agrees that it shall comply with all applicable federal, state, regional and local laws, regulations and ordinances protecting the environment and natural resources including, but not limited to, the Federal Clean Water Act, Safe Drinking Water Act, Clean Air Act, Resource Conservation Recovery Act, Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("Superfund") and all rules and regulations promulgated or adopted thereunder as same may from time to time be amended. Concessionaire further expressly represents, covenants, warrants, guarantees, and agrees that it shall fully comply with all state and local laws, ordinances, rules, and regulations protecting the environment. Concessionaire agrees to keep informed of future changes in the existing environmental laws.

Concessionaire hereby expressly agrees to indemnify and hold Authority harmless from and against any and all liability for fines and physical damage to property or injury or deaths to persons, including reasonable expense and attorney's fees, arising from or resulting out of, or in any way caused by, Concessionaire's failure to comply with any and all applicable federal, state and local laws, ordinances, regulations, rulings, orders and standards, now or hereafter, promulgated for the purpose of protecting the environment. Concessionaire agrees to cooperate with any investigation or inquiry by any governmental agency regarding possible violation of any environmental law or regulation.

**ARTICLE 18**
**Non-Discrimination**

Concessionaire, for itself, its personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree, that (1) no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities; (2) that in the construction of any improvements in its assigned area and the furnishing of services thereon, no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination; (3) that Concessionaire shall use the Premises in compliance with all other requirements imposed or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary,

Part 21, Nondiscrimination in Federally assisted programs of the Department of Transportation-Effectuation of Title VI of the Civil Rights Act of 1964, and as said regulations may be amended. That in the event of breach of any of the above nondiscrimination covenants, the Authority shall have the right to terminate the Agreement.

**ARTICLE 19**
**Affirmative Action**

Concessionaire assures that it will undertake an affirmative action program as required by 14 CFR Part 152, Subpart E, to ensure that no person shall on the grounds of race, creed, color, national origin, or sex be excluded from participating in any employment activities covered in 14 CFR Part 152, Subpart E. Concessionaire assures that no person shall be excluded on these grounds from participating in or receiving the services or benefits of any program or activity covered by this subpart. Concessionaire assures that it will require that its covered suborganizations provide assurances to Concessionaire that they similarly will undertake affirmative action programs and that they will require assurances from their suborganizations, as required by 14 CFR Part 152, Subpart E, to the same effect.

**ARTICLE 20**
**Disadvantaged Business Enterprise**

Concessionaire shall comply with Authority's approved Airport Concession Disadvantaged Business Enterprise (ACDBE) program submitted in compliance with all other requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Office of the Secretary, Part 23, Participation by DBE programs of the Department of Transportation-Effectuation of Title VI of the Civil Rights Act of 1964 and as said regulations may be amended. Further provided, that no person shall be excluded from participation in, denied the benefits of, or otherwise discriminated against in connection with the award and performance of any contract, including subcontracts, covered by 49 CFR Part 23 on the grounds of race, color, national origin or sex. Concessionaire shall make good faith efforts to attain the goal of DBE participation of nine percent (9%) as set by the Authority for this Agreement.

Concessionaire will inform the Airport Authority what ACDBEs will be used in providing the services described. Concessionaire agrees that within sixty (60) days after the expiration of each Federal fiscal year during the term of this Agreement, it will provide a report to the Airport Authority, in a form acceptable to the Authority, describing the gross receipts of each such ACDBE (and each substitute ACDBE obtained), and the dollar value of other goods and services purchased by the Concessionaire from each such ACDBE, in each case calculated in accordance with the requirements outlined in 49 CFR Part 23.

Concessionaire agrees that it will also submit within the same period described above a report to the Authority, in a form acceptable to the Authority, describing the Concessionaire's total gross receipts for the entire contract.

Concessionaire will have no right to terminate an ACDBE for convenience without the Authority's prior written consent. If an ACDBE is terminated by the Concessionaire with the Authority's consent or because of the ACDBEs default, then the Concessionaire must make a good faith effort, in accordance with the requirements of 49 CFR Part 23.25 (e)1(iii) and (iv) and 49 CFR Part 26.53 to find another ACDBE to substitute for the original ACDBE to perform the same estimated gross receipts) under the contract as the ACDBE that was terminated.

The Concessionaire's breach of its obligations above shall be a default by the Concessionaire and shall entitle the Authority to exercise all of its contractual and legal remedies, including termination of this Agreement.

**ARTICLE 21**
**Americans With Disabilities Act**

Concessionaire shall comply with the requirements of "The Americans with Disabilities Act" (ADA) as published in the Federal Register, Volume 56, No. 144 and the State of Florida Accessibility Requirements Manual (ARM).

**ARTICLE 22**
**Primary Lien Of Authority**

All sums which shall be due the Authority hereunder by reason of any provisions of the Agreement are and shall always be secured by a valid and first lien upon the equipment and other personal properties including taxicabs utilized in the operation of these facilities by Concessionaire.

**ARTICLE 23**
**Attorney's Fees And Costs**

Concessionaire agrees to pay, in the event of a default under the terms hereof, all costs, expenses and reasonable attorney's fees incurred in the collection of any fees due hereunder or in the enforcement by the Authority of any of the terms, covenants and conditions hereof, including those costs, expenses and reasonable attorney's fees incurred in appellate proceedings.

**ARTICLE 24**
**Invalidity Of Clauses**

The invalidity of any portion, article, paragraph, provision or clause of this Agreement shall have no effect upon the validity of any other part of portion thereof.

**ARTICLE 25**
**Subordination Of Bond Resolution**

This Agreement and all rights of Concessionaire hereunder are expressly subordinated and subject to the lien and provisions of any pledge, transfer, hypothecation, or assignment made (at any time) by Authority to secure Bond financing. This Agreement is subject and subordinate to the terms, covenants, and conditions of the Bond Resolution authorizing the issuance of Bonds by Authority. Authority may amend or modify the Bond Resolution or make any change thereto that does not materially adversely affect Concessionaire rights under this Agreement. Conflicts between this Agreement and the Bond Resolution shall be resolved in favor of the Bond Resolution.

**ARTICLE 26**
**Federal Right to Reclaim**

In the event a United States governmental agency shall demand and take over the entire facilities of the Airport or the portion thereof wherein the Premises are located, for public purposes, then this Agreement shall thereupon terminate and Authority shall be released and fully discharged from any and all liability hereunder. In the event of such termination, Concessionaire's obligation to pay a concession fee, rents and other charges shall cease, however, nothing herein shall be construed as relieving Concessionaire from any of its liabilities relating to events or claims of any kind whatsoever prior to this termination.

## ARTICLE 27
**Rights Reserved To The Authority**

Rights not specifically granted to the Concessionaire by this Agreement are expressly and independently reserved to the Authority.

## ARTICLE 28
**Remedies Cumulative**

The rights and remedies of parties hereto with respect to any of the terms and conditions of this Agreement shall be cumulative and not exclusive and shall be in addition to all other rights and remedies of the parties.

## ARTICLE 29
**Notices And Communications**

All notices or other communications to Authority or to Concessionaire pursuant hereto shall be deemed validly given, served, or delivered, upon deposit in the United States mail, registered and with proper postage and registration fee prepaid, addressed as follows:

| TO AUTHORITY: | TO CONCESSIONAIRE: |
| --- | --- |
| Sarasota Manatee Airport Authority | Diplomat Airport Transportation, Inc. |
| Sarasota Bradenton International Airport | 5421A 15th Street E |
| 6000 Airport Circle | Bradenton, FL 34203 |
| Sarasota, Florida 34243 | |

or to such other address as the addressee may designate in writing by notice to the other party delivered in accordance with the provisions of this Article.

## ARTICLE 30
**Miscellaneous**

All of the terms and provisions hereof shall be binding upon and the benefits inure to the parties hereto and their heirs, personal representatives, successors and assigns. Wherever used, the singular number shall include the plural, the plural the singular and the use of any gender shall include all genders. This Agreement, and instruments or documents relating to same, shall be construed under Florida law. This Agreement represents the complete Agreement of the parties and any prior agreements or representations, whether written or verbal, are hereby superseded. This Agreement may subsequently be amended only by written instrument signed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto for themselves, their successors and assigns, have executed this Agreement the day and year first written.

**AUTHORITY:**

SARASOTA MANATEE AIRPORT AUTHORITY

By: ______________________

Printed Name: Eric Robinson
Title: Chairman

**CONCESSIONAIRE:**

DIPLOMAT AIRPORT TRANSPORTATION, INC.

By: ______________________

Printed Name: Jorge Resendiz
Title: President

WITNESSES:

______________________

______________________

As to Authority

______________________

______________________

As to Concessionaire

# EXHIBIT A

## Rates and Charges to Customers

(To be provided)

# EXHIBIT B

ATTACHMENT TO:
Sarasota Bradenton International Airport - Lease and Concession Agreement

## SWORN STATEMENT PURSUANT TO SECTION 287.133(3)(a) FLORIDA STATUTES, ON PUBLIC ENTITY CRIMES

THIS FORM MUST BE SIGNED AND SWORN TO IN THE PRESENCE OF A NOTARY PUBLIC OR OTHER OFFICIAL AUTHORIZED TO ADMINISTER OATHS.

1. This sworn statement is submitted to SARASOTA MANATEE AIRPORT AUTHORITY
   by: Jorge Resendiz, President
   (print individual's name and title)
   for: Diplomat Airport Transportation
   (print name of entity submitting sworn statement)
   whose business address is: 5421 A 15th Street E
   Bradenton, FL 34203

   and, (if applicable) its Federal Employer Identification Number (FEIN) is 76 - 0831341
   (if the entity has no FEIN, include the Social Security Number of the individual signing this sworn statement) ______

2. I understand that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including, but not limited to, any bid or contract for goods or services, any lease for real property, or any contract for the construction or repair of a public building or public work, involving antitrust, fraud, theft, bribery, collusion, racketeering, conspiracy, or material misrepresentation.

3. I understand that "convicted" or "conviction" as defined in paragraph 287.133(1)(b), Florida Statutes, means a finding of guilt or a conviction of a public entity crime, with or without an adjudication of guilt, in any federal or state trial court of record relating to charges brought by indictment or information after July 1, 1989, as a result of a jury verdict, nonjury trial, or entry of a plea of guilty of nolo contendere.

4. I understand that an "affiliate" as defined in Paragraph 287.133(1)(a), Florida Statutes, means:
   (1) A predecessor or successor of a person convicted of a public entity crime; or
   (2) An entity under the control of any natural person who is active in the management of the entity and who has been convicted of a public entity crime. The term "affiliate" includes those officers, directors, executives, partners, shareholders, employees, members, and agents who are active in the management of an affiliate. The ownership by one person of shares constituting a controlling interest in another person, or a pooling of equipment or income among persons when not for fair market value under an arm's length agreement, shall be a prima facie case that one person controls another person. A person who knowingly enters into a joint venture with a person who has been convicted of a public entity crime in Florida during the preceding thirty-six (36) months is considered an affiliate.

5. I understand that a "person" as defined in Paragraph 287.133(1)(e), Florida Statutes means any natural person or entity organized under the laws of any state or of the United States with the legal power to enter into a binding contract and which bids or applies to bid on contracts let by a public entity, or which otherwise transacts or applies to transact business with a public entity. The term "person" includes those officers, directors, executives, partners, shareholders, employees, members, and agents who are active in management of an entity.

6. Based on information and belief, the statement which I have marked below is true in relation to the entity submitting this sworn statement. (Indicate by placing a check ( ✓ ) in front of the appropriate statement. **Check only one statement)**

✓ Neither the entity submitting this sworn statement, nor any of its officers, directors, executives, partners, shareholders, employees, members or agents who are active in the management of the entity, nor any affiliate of the entity was charged with and convicted of a public entity crime subsequent to July 1, 1989.

_____ The entity submitting this sworn statement, or one or more of its officers, directors, executives, partners, shareholders, employees, members, or agents who are active in the management of the entity, or an affiliate of the entity was charged with and convicted of a public entity crime subsequent to July 1, 1989.

_____ The entity submitting this sworn statement, or one or more of its officers, directors, executives, partners, shareholders, employees, members, or agents who are active in the management of the entity, or an affiliate of the entity was charged with and convicted of a public entity crime subsequent to July 1, 1989. However, there was a subsequent proceeding before a Hearing Officer of the State of Florida, Division of Administrative Hearings, and the Final Order entered by the Hearing Officer determined that it was not in the public interest to place the entity submitting this sworn statement on the convicted vendor list. (attach a copy of final order)

I UNDERSTAND THAT THE SUBMISSION OF THIS FORM TO THE CONTRACTING OFFICER FOR THE PUBLIC ENTITY IDENTIFIED IN PARAGRAPH 1 (ONE) ABOVE IS FOR THAT PUBLIC ENTITY ONLY, AND THAT THIS FORM IS VALID THROUGH DECEMBER 31 OF THE CALENDAR YEAR IN WHICH IT IS FILED. I ALSO UNDERSTAND THAT I AM REQUIRED TO INFORM THE PUBLIC ENTITY, PRIOR TO ENTERING INTO A CONTRACT IN EXCESS OF THE THRESHOLD AMOUNT PROVIDED IN SECTION 287.017, FLORIDA STATUTES, FOR CATEGORY TWO, OF ANY CHANGE AFFECTING THE CORRECTNESS OF THE INFORMATION CONTAINED IN THIS SWORN STATEMENT.

[signature]
(Signature) (Date)

Jorge Resendiz
(Printed Name)

STATE OF Florida
COUNTY OF Sarasota

Personally appeared before me, the undersigned authority [signature], who is personally known to me or who has produced ____________ as identification, and who, after first being sworn by me, affixed his/her signature in the space provided above on this 18th day of June, 2009.

Nancy K. Burgess
Signature of Notary Public

Nancy K. Burgess
Printed Name of Notary Public

My Commission Expires:

(SEAL) NOTARY PUBLIC STATE OF FLORIDA
NANCY K. BURGESS
MY COMMISSION # DD593916
EXPIRES: Dec. 22, 2010
(407) 398-0153 FloridaNotaryService.com

SARASOTA BRADENTON INTERNATIONAL

# EXHIBIT C

## GROUND TRANSPORTATION OPERATING RULES & REGULATIONS

### Section 1
### Introduction

The Sarasota Manatee Airport Authority has established Ground Transportation Operating Rules and Regulations (hereafter Rules and Regulations) for all commercial vehicle companies operating at the Sarasota Bradenton International Airport. These Rules and Regulations are to ensure the most fair and consistent ground transportation service. It will provide the public with the safest and most convenient passenger movement.

It is imperative that all commercial vehicle operators abide by these Rules and Regulations. Commercial vehicle operators are subject to on site supervision and direction by any personnel so designated by the Authority or its authorized representative. Any person who violates these Rules and Regulations will, at the discretion of the Authority or its authorized representative, be denied use of the Airport and its facilities.

The Authority reserves the right to change these Rules and Regulations at any time, for any reason and any respect. Commercial vehicle operators will be notified of any changes in these Rules and Regulations by the issuance of either revised pages for this document or separate directives.

Any regulations or parts of regulations specifically relating to commercial vehicles at the Airport, that are in conflict with these regulations, are hereby superseded by these regulations, but only to the extent of the conflict.

### Section 2
### Definitions

Unless specifically defined otherwise herein, or unless a different meaning is apparent from the context, the terms used in these Rules and Regulations shall have the following definitions:

**Airport** - shall mean Sarasota Bradenton International Airport, located in Sarasota and Manatee Counties, Florida.

**Airport Circle** - shall mean the roadway circling the public parking lots and passing in front of the terminal building.

**Authority** - shall mean the Sarasota Manatee Airport Authority, a special district created by the Legislature of the State of Florida, pursuant to Chapter 2003-309, Laws of Florida as amended, which owns and operates the Airport.

**Arrival Flight Time** - The actual time the flight lands at the Airport.

**Arriving Passenger** - shall mean any person who arrives at the Airport by way of a flight.

**Commercial Vehicle** - shall mean any vehicle for compensation or hire or courtesy vehicles provided at no charge by hotels, motels, rental car companies, etc. for the convenience of their patrons.
Commercial Vehicles for hire include:
- Baggage Delivery Service: vehicles used for the exclusive purpose of carrying baggage to/from the airport; no passengers may be carried
- Buses: vehicles over 25 feet, seating capacity of more than 15
- Limousines: non metered vehicle, less than 25 feet in length, seating capacity of 14 or less
- Taxicabs: fares determined by meter, less than 25 feet in length, seating capacity of 6 or less
- Vans/Shuttles: non metered vehicle, less than 25 feet in length, seating capacity of 15 or less, used for single or multi-passenger pickups for one or more destinations

**Commercial Vehicle Queuing Area** - shall mean the three lanes on the West end of the terminal building which are specifically designated for passenger pick up by commercial vehicles.

**Cruising** - shall mean the repetitive circling of the airport access roads for advertisement or to attract potential unauthorized pickups.

**Departing Passenger** - shall mean any person who is leaving the Airport by way of a flight.

**Driver** - shall mean any person who drives or is in actual physical control of a vehicle on a roadway, parking lot or any other location on Airport property; or one who is exercising control of a vehicle or steering a vehicle being towed by another motor vehicle.

**Flight** -- shall mean a trip made by or in an airplane.

**Ground Transportation Permit** - shall mean an authorization by the Authority or its representative to conduct commercial ground transportation activities at the Airport.

**Ground Transportation Operating Rules and Regulations** - shall mean all procedures, rules, and regulations established by the Authority or its representative, relating to commercial ground transportation activities.

**Non-Tenant Car Rental** - shall mean any individual or company engaged in the business of renting or leasing passenger vehicles to passengers using the Airport that does not have a tenant concession agreement in effect with the Authority. The operation of shuttle vehicles shall be governed by these Rules and Regulations; however, non-tenant car rental organizations must also comply with all provisions of the Non Tenant Rental Car Business Permit.

**Operator** - shall mean any company or person engaged in any type of commercial ground transportation service.

**Park** - shall mean to put or leave or let a motor vehicle stand or stop in any location, whether the driver thereof leaves or remains in the vehicle.

**Permit Sticker** - shall mean an Authority approved sticker to be affixed to a vehicle. This sticker shall have a number and permit year printed on it.

**Solicitation or "to solicit"** - shall mean to directly or indirectly, actively or passively, openly or subtly, ask, request, seek, or try to obtain the purchase, sale, lease or exchange of goods or services, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services, or any form of paid advertising.

## Section 3
## Operating Rules And Regulations

### 3.1 Conditions Of Commercial Vehicles And Drivers

3.1.1 All commercial vehicles serving the Airport shall be of high quality, properly maintained in an excellent state of repair and operated in a clean, safe, and businesslike manner as determined by the Authority or its authorized representative.

3.1.2 All commercial vehicles shall be properly identifiable with company name and/or logo on the outside of the vehicle to enable passengers to identify the company name. Posting of company name and/or logo on license plates or in other discrete locations is acceptable.

3.1.3 All commercial vehicles shall be validly registered with the Florida Department of Motor Vehicles.

3.1.4 All drivers operating commercial vehicles at the Airport shall be clean and neat in their personal appearance and shall be courteous to passengers loading or unloading at the Airport.

3.1.5 All personnel of the Operator shall be properly licensed and adequately trained

3.1.6 The Operator shall provide the Authority with adequate evidence of the fact that it carries Automobile Liability insurance with a reputable insurance company or companies in such amounts as are required for valid operation under all state or local laws or under permit with Authority, with specific coverage or endorsement making such insurance applicable to its operations at the Airport.

3.1.7 Vehicle insurance shall cover all automobiles owned, leased, hired, rented, borrowed or otherwise used by or on behalf of the Operator and an endorsement shall require that the Authority be named as additional insured and the Authority shall be notified thirty (30) days prior to cancellation or non-renewal of said endorsement.

3.1.8 The Operator shall have available inside each vehicle a listing of current rates for viewing upon request of the passenger. In addition, a certificate of insurance or other verification of vehicle insurance must be carried within the vehicle and produced upon request.

3.1.9 Failure to abide by the above regulations may result in driver's Airport operating privileges being revoked at the discretion of the Authority or its authorized representative.

## 3.2 Regulations And Licenses

3.2.1 The Operator shall comply with all applicable local, state and federal laws and regulations and to abide by the rules and regulations of the Authority now in effect, or that may be promulgated from time to time, including but not limited to the utilization of commercial vehicle queuing areas, and other such traffic control arrangements as designated by the Authority. The Operator will provide the Authority with current copies of all applicable licenses from state or local authorities for areas the Operator proposes to serve.

3.2 2 The Operator shall secure and pay the costs of all required licenses, supplementary equipment, permits, and franchises, both of its employees and vehicles. The Operator will pay all taxes, fees, licenses, and moneys required by the Federal, state, or local governments for its operations at the Airport.

3.2.3 The Operator shall maintain and operate its service in compliance with all requirements imposed pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary, and Part 21 Nondiscrimination in Federally Assisted Programs of the Department of Transportation-Effectuation of Title 6 of the Civil Rights Act of 1964, as said regulations may be amended.

## 3.3 Access And Parking

3.3.1. Commercial vehicles may use those lanes of Airport Circle that are closest to the main terminal building for departing passengers only. Commercial vehicles stopping at the curbside of the Airport's terminal building shall be restricted specifically to active unloading of passengers and their baggage. No pickup or parking shall be allowed in this area. Baggage delivery service vehicles must use the commercial vehicle queuing area for both loading and unloading baggage Commercial vehicles in violation of this rule may be cited and towed away in accordance with Florida State Statute 316-1945. Commercial vehicles not having a Ground Transportation Permit with the Authority are authorized to enter Airport property only to discharge passengers in accordance with this paragraph.

3.3.2 All commercial vehicles desiring to pick up passengers must obtain a Ground Transportation Permit and display the Authority approved permit sticker in the lower left corner of the front windshield for access to the commercial queuing area (County Transit Authority buses and occasional charter/tour buses are exempt from this requirement). Authorized commercial vehicles entering the Airport without passengers shall access the commercial vehicle queuing area via the outside lane of Airport Circle or from US Highway 41/General Spaatz.

3.3.3 Passenger pickup by commercial vehicles is permitted only in the commercial vehicle queuing area. Pickups by Operators other than Taxicab Concession Operator may be made on a prearranged basis only. VIP pickups may be arranged by contacting the Airport Police Department in advance of the date of the pickup.

3 3 4 Parking in the commercial vehicle queuing area is designated as follows:

Lane 1 - Taxicab Concession Operator Only
Lane 2 – Commercial vehicles other than buses
Lane 3 – Buses only (vehicles over 25 feet, carrying more than 15 passengers)

3 3.5 Authorized commercial vehicles shall enter the commercial vehicle queuing area only for the purpose of loading customers or passengers.

3.3.6 Parking in lanes 2 and 3 of the commercial vehicle queuing area shall be limited to 30 minutes.

3.3.7 Vehicles may not be left unattended in the commercial vehicle queuing area unless the driver contacts the Airport Police Department to inspect their vehicle. Upon clearance by the police officer, the driver may enter the airport terminal to meet arriving passengers near the down escalator.

3.4 **Miscellaneous Provisions**

3.4.1 The Operator shall repair promptly, and at no cost to the Authority, any damages to property of the Authority which have been caused by the Operator or its representatives.

3.4.2 No signs, posters or similar devices shall be erected, displayed, or maintained by the Operator on Airport premises without prior written approval of the Authority or its authorized representative.

3.4 3 Solicitation of business in any manner whatsoever upon Airport property is strictly prohibited. Cruising is specifically prohibited.

3.4.4 The Authority or its representatives shall have the right to restrict drivers from operating at the Airport who do not comply with these Rules and Regulations or orders from authorized Authority representatives.

3 4 5 Unauthorized commercial vehicles operating on airport property may be cited by the Airport Police in accordance with Florida Statutes

3 4 6 Special events (tours, etc ) should be coordinated through the Properties Department

# ASSIGNMENT OF CONCESSION AGREEMENT
## (On Demand Metered Taxicabs & Non-Metered Limousine Service)

**KNOW ALL MEN BY THESE PRESENTS:**

By this ASSIGNMENT, Diplomat Airport Transportation, Inc. (the "**Assignor**"), in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby assigns, transfers and sets over the ON DEMAND METERED TAXICABS & NON-METERED LIMOUSINE SERVICE Concession Agreement executed June 19, 2009 (the "**Concession Agreement**") to SRQ Taxi Management, LLC a Florida limited liability company (the "**Assignee**").

This Assignment is intended to convey and transfer all rights, duties and obligations allowed and imposed by the Concession Agreement to Assignee. Assignee hereby assumes and covenants to perform all of the obligations of Assignor under the Concession Agreement.

IN WITNESS WHEREOF, Assignor and Assignee have caused their hands and seals to be set this 11th day of ~~March~~ MAY, 2016.

**ASSIGNOR:**

[signature]
Diplomat Airport Transportation, Inc.

**Assignee hereby accepts the Assignment of the Concession Agreement and all terms stated therein.**

**ASSIGNEE:**

[signature] Mgr.
SRQ Taxi Management, LLC, a Florida limited liability company

In accordance with Article 13 of the Concession Agreement, the assignment from Diplomat Airport Transportation, Inc. to SRQ Taxi Management, LLC is approved.

Sarasota Manatee Airport Authority
By: [signature]
Its: CHAIR
CARLOS BERUFF

# ASSIGNMENT OF CONCESSION AGREEIVIENT

(On Demand Metered Taxicabs & Non.-Metered Limousine Service)

KNOW ALL MEN BY DOSE PRESENTS:

By this ASSIGNMENT, Diplomat Airport Transportation, Inc. (the "Assignor"), in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby assigns, transfers and sets over the ON DEMAND METERED TAXICABS & NON-METERED LIMOUSINE SERVICE Concession Agreement executed June 19, 2009 (the "Concession Agreement") to SRQ Taxi Management, LLC a Florida limited liability company (the "Assignee").

This Assignment is intended to convey and transfer all rights, duties and obligations allowed and imposed by the Concession Agreement to Assignee. Assignee hereby assumes and covenants to perform all of the obligations of Assignor under the Concession Agreement.

IN WITNESS WHEREOF, Assignor and Assignee have caused their hands and seals to he set this f1 day of NagFeli, 2016.

PA,

ASSIGNOR:

Diplomat AirlSort Transportation, Inc.

Assignee hereby accepts the Assignment of the Concession Agreement and all terms stated therein.

ASSIGNEE:

SR, . Taxi-MainaOinen .,LC a Florida limited liability .creinip.a V

In accordance with Article 13 of the Concession Agreement, the assignment from Diplomat Airport Transportation, Inc. to SRQ Taxi. Management, LLC is approved.

Sarasot a art Authority
By: ______________
Its: CA-1IZ

ZO

EXHIBIT
C

Request Uber at Sarasot ×

Secure | https://www.uber.com/airports/srq/

tabbies EXHIBIT D

# Pickup tips at SRQ

### When to request an Uber

Request your ride once you've collected your luggage from baggage claim and are ready to step outside. Use the app to select your pickup terminal.

Your driver's vehicle has room for luggage, but if you have multiple bags or riders, consider a larger vehicle to accommodate.

### Identifying your driver

If the airport is crowded, consider contacting your driver to confirm your pickup location. Reference the app to note the name and license plate number of your ride, and be on the look out for your driver as he or she approaches.

Rides to the airport

# Drop-off tips at SRQ

### Can I take Uber to SRQ?

You sure can! Use the Uber app to request a ride when you're ready to go. It's recommended that you arrive at SRQ at least 2 hours before your domestic flight departs and 3 hours before an international flight

### Is there enough room for my luggage?

If you're traveling with a group, or have a lot of luggage, consider a high-capacity vehicle. UberXL is a rideshare option that seats up to four riders.


Request Uber at Sarasot
Secure | https://www.uber.com/airports/srq/
UBER
Ride
Drive
SIGN UP TO RIDE
Ride Uber at Sarasota–Bradenton International Airport
Whether an early morning flight or late-night red eye, ride Uber on-demand at SRQ any hour of the day, every day of the year
SIGN UP IN MINUTES →

EXHIBIT
E

Request Uber at Sarasota

Secure | https://www.uber.com/airports/srq/



AIRPORTS > SARASOTA-BRADENTON INTERNATIONAL AIRPORT

Pickups at the airport

# How to request Uber at SRQ

1 — Select your vehicle type

If you're traveling in a group or have extra bags, consider a high-capacity vehicle like uberXL.

Note that uberPOOL is not yet an option when requesting pickups at SRQ.

2 — Confirm your pickup location

After requesting a ride, confirm your location when prompted by the app. All pickups will be curbside at the baggage claim level. Confirm the side and door where you will be picked up within the app. If you are unsure of your side and door, check the signs posted outside.

3 — Meet your driver curbside

If the airport is crowded, you can use the app to contact your driver to confirm the correct pickup point.

MPD

Mills Paskert Divers
ATTORNEYS AT LAW
TAMPA ♦ ATLANTA

100 North Tampa Street
Suite 3700
Tampa, Florida 33602

Telephone: 813-229-3500
Facsimile: 813-229-3502
www.mpdlegal.com

February 14, 2017

***<u>via Email and Registered U.S. Mail</u>***
Fredrick J. Piccolo
President and CEO
Sarasota Manatee Airport Authority
6000 Airport Circle
Sarasota, FL 34243-2105
fredrick.piccolo@srq-airport.com

Re: SRQ Taxi Management, LLC v. Sarasota Manatee Airport Authority
MPD File No. 117035

Dear Mr. Piccolo:

Please be advised that this firm has been retained to represent the interests of SRQ Taxi Management, LLC (hereinafter "SRQ Taxi") in regards to it ongoing dispute with the Sarasota Manatee Airport Authority (hereinafter the "Authority"). In that regard, you are advised to furnish all future communications concerning the dispute to the undersigned, who acts as legal counsel to SRQ Taxi.

As you know, SRQ Taxi is the successor, by approved assignment, to Diplomat Airport Transportation, Inc. ("Diplomat") under that certain Concession Agreement for On-Demand metered Taxicab & Non-Metered Limousine Service dated June 18, 2009 (hereinafter the "Concession Agreement"). The Authority's chairman approved the assignment of the Concession Agreement to SRQ Taxi on May 11, 2016. As such SRQ Taxi enjoys all of the rights and privileges to operate as described in the Concession Agreement to operate at the Sarasota Bradenton International Airport (hereinafter the "Airport"). As you also know, the Concession Agreement had an initial term of five (5) years terminating on August 31, 2014, but also provided the Authority with an option to renew the agreement for an additional five (5) year term at the end of the initial term. On

EXHIBIT
F

or about March 25, 2014, the Authority exercised this option and renewed the Concession Agreement for an additional five (5) year term beginning on September 1, 2014 and ending on August 31, 2019, on the same terms and conditions as were stated in the original agreement.

The purpose of this letter is to advise you that the Authority is in breach of its obligations under the Concession Agreement and demand that the Authority immediately take steps to cure its breach by directing the cessation of on-demand Transportation Network Company (hereinafter "TNC") operations at the Airport. SRQ Taxi is suffering enormous economic and business damages resulting from these on-going breaches of contract and the other impermissible and wrongful actions of the Authority in providing preferential operating terms and conditions and permitting the TNC's to operate on-demand transportation services at the Airport. These breaches are continuing in nature and demand is hereby made for the cessation of the same.

SRQ Taxi intends to pursue all of its available legal remedies to seek its damages from all responsible parties for these contractual breaches and other violations of law. The responsible parties include all persons either directing, permitting or willfully interfering in SRQ Taxi's existing contracts with its drivers, customers and potential customers, as well as those who have sanctioned or directed the unconstitutional and disparate treatment afforded SRQ Taxi and the TNCs operating at the Airport.

The disparate treatment referenced above generally includes allowing the TNC's and their independent drivers to operate without full compliance with all of the Ground Transportation Rules and Regulations (the "Rules") now in effect at the Airport.[1] These Rules specifically delineate TNC vehicles as "Commercial Vehicles" and require full compliance with the Rules, but the Authority and its law enforcement, or other Authority officials, are taking no steps to enforce the requirements of the Rules upon the TNCs or their driver partners, while nonetheless requiring that SRQ Taxi to comply with these

[1] The current Rules are attached as Exhibit A.

same Rules. This denial of equal protection under the laws and disparate enforcement of the law is unconstitutional as applied. Again, those authorizing and directing this disparate treatment are guilty of civil rights and other violations that, if necessary, will be prosecuted against them individually. Examples of the unequal treatment include, *but are not limited to*: (1) not requiring the TNC independent partners or Operators who are operating vehicles at the Airport to maintain the state required insurance for commercial for-hire vehicles in accordance with existing state statute and Sections 3.1.6 and 3.1.7 of the Rules (including the specific endorsement required by the Rules and each policy naming the Authority as an additional insured); (2) not requiring the TNC vehicles to operate with the appropriate vehicle identification and permits required by Section 3.1.2 of the Rules; (3) not requiring all TNC commercial vehicles to be ten model years of newer as required by Section 3.1.1 of the Rules; (4) not requiring the TNC personnel to be properly licensed and adequately trained as required by Section 3.1.5 of the Rules; (5) not requiring compliance with applicable local, state and federal laws, including the Americans with Disabilities Act and the provisions of 49 CFR Part 21 requirements concerning non-discrimination in Federally Assisted Programs and Title 6 of the Civil Rights Act of 1964; (6) by providing preferable signage and queuing positions for the TNCs and their Operators over SRQ Taxi signage and queuing positions; (7) by providing preferable boarding and loading zones to the TNCs and their Operators over those provided to SRQ Taxi; (8) by not requiring the TNCs and their independent Operators to obtain and display their Ground Permit Stickers as required by Section 3.3.2; (9) by allowing TNC vehicles and their independent Operators to repeatedly gain access and park in violation of Section 3.3.1 of the Rules; (10) by providing TNC vehicles with an exemption, which is inapplicable to every other commercial vehicle regulated by the Rules, to avoid the commercial vehicle queuing area and proceed directly to passenger pickup and boarding areas; (11) by not enforcing the existing requirement of Section 3.3.3 that pickups by Operators of commercial vehicles, including

TNC vehicles, other than SRQ Taxi (as the Taxicab Concession Operator) may only be made on a prearranged basis[2]; (12) by not citing unauthorized vehicles operating as commercial for-hire vehicles at the Airport; and (13) by allowing TNC's and their independent Operators to transfer, convey, sell, borrow or assign their permit(s), if any, to other non-approved drivers and vehicle operators in violation of Section 3.4.8 of the Rules (hereinafter collectively the "Violations").

The Concession Agreement provides in pertinent part as follows:

**4.2 Queuing Area and Starter Counter**

> Concessionaire shall be granted the right to pick up its customers in the first (inside) lane of the ground transportation queuing area ***or other areas as authorized by the Authority***. (emphasis added)

**4.3 Authority's Right to Permit Other Ground Transportation**

> Such rights herein granted Concessionaire do not prevent the Authority from permitting other methods of passenger ground transportation, as for example rental cars, limousines, buses ***or private passenger cars not for hire***[3]***.***
>
> A. The Authority reserves the right to authorize properly identified hotel, motel and rental car concessionaire courtesy cars operating on a not for hire basis to pick up their customers in the second lane of the ground transportation queuing area
>
> B. The Authority reserves the right to permit other properly marked, licensed taxicabs and limos to pick up passengers ***who have made specific advance reservations***[4] for such pick-ups.
>
> C. The operations of such hotel, motel and rental car concessionaire courtesy cars, ***taxicabs and limos with advance reservations***[5]

---

[2] The Concession Agreement expressly provides that this requires "***specific advance reservations for such pickups.***" *See:* Article 4.3(B).

[3] This language expressly limits such other Ground Transportation Services to those that are "not for hire." TNCs are under the Authority's existing Rules "for-hire" Commercial Vehicles.

[4] This language is consistent with the Concession Agreement's requirement that only pick-ups of passengers with "***specific advance reservations***" are permitted.

[5] *See:* Footnotes 2 and 4 above which require "***specific advance reservations***" before a commercial for-hire vehicle may otherwise pick-up at the Airport.

***will not be permitted to engage in any solicitation of passengers at the terminal complex.***

D. In specific instances where an airline flight is unable to proceed to its ultimate destination due to inclement weather, flight cancellations or flight irregularities, the airlines will have the right to secure such ground transportation as may be required to transport their passengers without infringing upon rights of Concessionaire.

E. It is further understood between the parties that it is the intention of the Authority to permit municipal buses serving the general public to enter the premises of the Airport for the purpose of picking up and discharging passengers. (emphasis added).

**5.1 <u>General Standards</u>**

Concessionaire shall furnish good, prompt, and courteous service, ***adequate to reasonably meet all reasonable demands for on demand taxi/limo service at the Airport,***[6] including the providing of service to persons with disabilities consistent with state and federal law. (emphasis added).

**5.2 <u>Availability of Service</u>**

***Concessionaire shall promptly furnish adequate taxi/limo service at all times during the day and night as may be required by passenger demand***[7] and as any certified passenger airline doing business at the Airport may from time to time reasonably request. (emphasis added).

**ARTICLE 30**

**<u>Miscellaneous</u>**

This Agreement represents the complete Agreement of the parties and any prior agreements or representations, whether written or verbal, are hereby superseded. This Agreement may subsequently be amended only by written instrument signed by the parties hereto.

As can be seen from Article 4.2 above, the parties agreed that SRQ Taxi would be permitted to queue "at other areas authorized by the Authority." This right to queue its

[6] This Rules again demonstrates that SRQ Taxi, as the Concessionaire was intended to provide ***"all"*** of the "on-demand taxi/limo service at the Airport."
[7] *Accord:* Footnote 5 above.

vehicles includes the right to queue them *anywhere* the Authority allows other commercial vehicles to queue. Thus, the refusal to allow SRQ Taxi vehicles to queue or park where and how the TNC vehicles are permitted to do so is a direct and material breach of the agreement.

Similarly, while SRQ Taxi was not given an exclusive right to operate all forms of Ground Transportation at the Airport, it was given the exclusive right to operate all ***on-demand*** for hire commercial vehicles. This right is made abundantly clear by the examples of limited carved-out exceptions to its otherwise exclusive Ground Transportation rights and privileges. The portions of the Concession Agreement referenced above, as well as others, make clear that the parties intended that SRQ Taxi would be providing ***"all" on-demand*** for-hire taxicab and limousine services at the Airport during the term of the agreement. This is expressly provided for in the Concession Agreement wherein the Authority reserved only the right to allow "licensed taxicabs and limos to pick up passengers ***who have made specific advance reservations*** for such pick-ups." In short, the non-exclusive provisions of the Concession Agreement apply only to "prearranged" for hire Ground Transportation services where ***"specific advanced reservations"*** were made for the passenger pick-ups. The only other exception is for other vehicles that are "***not for hire***". Of course, TNCs fit neither of these definitions. Specifically, your Rules identify TNCs as "Commercial Vehicles" that ***are*** for-hire. More importantly, those vehicles are clearly ***on-demand*** for-hire vehicles where no ***"specific advanced reservations"*** have been made by the passengers. Rather, the TNCs and their customers use an on-demand e-hail button on their smart phones to immediately hail a vehicle after retrieval of their baggage. [8] Many observations of deplaning passengers, using their smart phones to immediately hail an on-demand TNC vehicle have already been observed and documented. This, however, is not news to the

[8] The Authority's website actually admits and encourages the breach by stating: "When to request an Uber—Request your ride once you've collected your luggage from baggage claim and are ready to step outside." This in no way complies with the Concession Agreement's or Rules' requirements that ***"specific advance reservations"*** have been made for the passenger pick-up before it is authorized.

Authority, who blatantly supports, encourages and assists these on-demand rides in violation of its contractual obligations. In fact, the Authority's website recognizes the TNC service provided by "Uber" as an "on-demand" service. (*See:* **Exhibit B**). Thus, the Authority has materially breached its obligations to SRQ Taxi. These breaches also include breaches of the implied covenants of good faith and fair dealing that are part of every contract under Florida law. In short, there can be no question of the Authority's failure to deal with SRQ Taxi fairly and in good faith when it has ignored its own rules, violated the express terms of the parties' contract and then assisted the TNC's in developing their on-demand clientele, while nonetheless being contractually obligated to restrict such for hire Ground Transportation services to circumstances involving ***"specific advanced reservations"*** for the pick-ups. SRQ Taxi has and continues to pay substantial sums to the Authority to enjoy the right and privilege of providing ***all*** of the ***on-demand*** taxi and limo service at the Airport.

The Authority's actions and omissions have caused and continue to cause substantial harm and damages to SRQ Taxi. This includes lost profits, lost opportunities and lost customers that will never call upon SRQ Taxi in the future. The losses also include the virtual destruction of the SRQ Taxi's airport business model, which includes millions of dollars in lost revenues and investments.

For all of these reasons, the Authority is hereby notified, in accordance with Article 29 of the Concession Agreement, of its material breach of the parties' contract. The Authority is instructed to immediately cease and desist from it activity in order to mitigate the damages being incurred. The Authority should do so by suspending all TNCs operations at the Airport.

In closing, SRQ Taxi also wishes to bring to your attention a few other important facts. First, Uber Cab began operating as an on-demand TNC in 2009, the very year the Concession Agreement was originally drafted. The agreement, however, made no provision for any such on-demand TNC services to be carved out of SRQ Taxi's

exclusive, for hire, on-demand Ground Transportation rights at the Airport. Thereafter, the Authority exercised its option to renew the Concession Agreement, effective in September, 2014. Yet again, however, it made no provision for any other on-demand, for-hire TNC transportation at the Airport. It is simply an inescapable conclusion that the parties to the Concession Agreement never intended to provide for a TNC on-demand exception or carve-out to SRQ Taxi's rights to provide ***"all"*** of the for hire, on-demand Ground Transportation services at the Airport.

Next, Article 30 of the parties' agreement clearly provides that the entire agreement is expressed in the written document. It can only be amended in writing and accordingly, if there is to be solution to this problem without litigation, the parties must sit down and negotiate that resolution now.

Finally, the parties' agreement, coupled with the provisions of F.S. 57.105(7), provides for recovery of SRQ Taxi's attorneys' fees in this case. Accordingly, the prompt resolution of the dispute, in advance of costly and lengthy litigation is in the Authority's best interests. Please contact me within the next week if the Authority desires to try and resolve this matter short of litigation. Otherwise, my client intends to take the necessary steps to fully protect both its interests and those of its drivers and owner/operators.

Best regards,
MILLS PASKERT DIVERS

E.A. "Seth" Mills, Jr.

EAM/cls
Enclosures